## DENNIS MOONEY, et al., v. MARY E. OLSÉN.

1. DECLARATIONS OF TESTATOR, *Competent Evidence of his Mental Condition.* While the declarations of a testator, either before or after the execution of his will, are as evidence of external facts stated, whether in support or impeachment of the will, mere hearsay and inadmissible, yet wherever the mental condition of the testator is a subject of inquiry, his statements and declarations are competent evidence thereof. Therefore, where a will is charged to have been executed through undue influence, and the circumstances surrounding the execution tend to show weakness and debility on the part of the testatrix, and the presence and active assistance of the principal devisees, *held*, that it is competent to show that for years prior there had been estrangement and ill-will between the testatrix and one of such devisees; and as evidence of such estrangement and ill-will, to introduce her statements and declarations.

2. WILL CONTESTED; *Undue Influence; What May be Shown.* In an action to contest a will on the ground of undue influence, a wider range of inquiry exists than in ordinary litigation. The contents of the will, the extent of the testator's estate, his family and connections, the terms upon which he stood with them, and the claims of particular individuals, the condition and relative situation of the legatees or devisees named, the situation of the testator himself, and the circumstances under which the will was made, are all proper to be shown.

3. ———— *Instructions as to Verdict; No Error, When.* When a court submitting certain questions to a jury, instructs them if they answer these questions in one manner to return a general verdict for plaintiff and if in another to return such a verdict for defendant, it is not error when thereafter the jury return the questions with their answers, but without any general verdict, to direct them to incorporate therewith a general verdict, and to state for whom the verdict should be.

4. ———— *Definition of a Word or Phrase; Presumption.* Where a court
   has given in its instructions the legal definition of a certain word or
   phrase, and such word or phrase is used in the questions submitted and
   answered, it will be presumed that it was used by court and jury with
   the meaning indicated by the definition.

5. ———— *Verdict Received, and Jury Discharged; No Error, When.* Where
   the record shows that at the close of the afternoon session, the jury hav-
   ing retired for consultation, the court did not order an adjournment, but
   simply took a recess, and at twelve o'clock at night called the jury in to
   inquire if they had agreed, withdrew one question previously submitted
   to them, and again the next morning at eight o'clock, that being one
   hour in advance of the regular time of convening court, called them in,
   received the verdict and discharged the jury, *held,* that though neither
   client nor counsel was present at eight o'clock, when the verdict was re-
   ceived and the jury discharged, and only the client present at twelve
   o'clock, yet as it does not appear that counsel were in any manner mis-
   led by the court, or could not have been present at each time the jury
   were called in, no error is shown, and none will be presumed.

### *Error from Leavenworth District Court.*

ACTION brought by *Olsen,* against *Mooney* and another, to
set aside the will of Lydia Foster, who died July 8, 1876.
Trial by a jury, at the March Term, 1877, of the district
court, and verdict against the will. The defendants below
filed their motion for a new trial, which was overruled, and
judgment rendered in favor of the plaintiff *Olsen,* upon the
verdict of the jury. Defendants bring the case here. Other
facts are stated in the opinion.

*Taylor & Gillpatrick,* for plaintiffs in error:

Undue influence to avoid a will must be an influence exer-
cised by coercion, imposition or fraud; not merely such as
arises from the influence of gratitude, affection, or esteem. It
must be an ascendency of another will over that of the tes-
tator, and it must be proven; it will not be inferred from op-
portunity and interest. *Seguine v. Seguine,* 4 Abb. (N. Y.)
191; *Leeper v. Taylor,* 47 Ala. 221; *Tyson v. Tyson,* 37 Md.
567; 48 Ind. 502; 34 N. Y. 155. What was done in this
case? The court assumed that the jury, by finding that the
will was not made without undue influence, meant to find

that the defendants or others had used such a degree of undue influence over the deceased as to overcome her free agency in the matter, and make the will theirs, not hers. Such was not the true construction of the findings. Lydia Foster was of sound mind; hence she could make the will. But the jury found it was not made without undue influence. We submit that, the testator being of sound mind and memory, in order to avoid the will the undue influence must have been of such degree as to overcome the free agency of the testator, and such fact must have been found affirmatively. It must have appeared from the questions and answers that the jury found that the undue influence compelled the testator to execute the will, and dispose of her property in a way she otherwise would not have done. Examine the testimony set out in the record, and the court will find that there is an absolute lack of testimony to sustain a finding that the will was the result of undue influence on the part of anyone.

It is error to submit to a jury questions of undue influence in an issue as to the validity of a will, in the absence of proof. (43 Pa. St. 46.) The jury having found that Lydia Foster was of sound mind, it was the duty of the court to have rendered a judgment in favor of the defendants below on the verdict returned.

The undue influence necessary to overthrow a testamentary disposition of real estate, must be of such a character as to dominate the will of a testator, and substitute the will of another in its stead. There must be such importunity or coercion as could not be resisted, so that the motion impelling the testator is tantamount to force or fear. *Bundy v. McKnight*, 48 Ind. 502; *Townly v. Long*, 76 Penn. St. 106; *Rabb v. Graham*, 43 Ind. 1; *Leeper v. Taylor*, 47 Ala. 221; *Tyson v. Tyson*, 37 Md. 567; *Hoge's Estate*, 2 Brews. (Pa.) 450; *Roe v. Taylor*, 45 Ill. 485; *Kevil v. Kevil*, 2 Bush (Ky.), 614.

Undue influence to avoid a will must be such as to overcome the free agency of the testator at the time the instrument was made. Influence arising from gratitude, affection, or other legitimate results of the family and social relations,

however great they may be, cannot operate to avoid a will. *Gardner v. Gardner,* 34 N. Y. 155; *Turner v. Cheesman,* 2 McCarter (N. J.), 243; *Moore's Ex'rs v. Blauvelt,* id. 367; *Hall's Heirs v. Hall's Ex'rs,* 38 Ala. 131; *Clark v. Davis,* Redf. (N. Y.) 249.

Undue influence, in order to avoid a will, must be such as to destroy the free agency of the testator at the time the instrument is made; it must be a personal constraint operating on the mind of the testator at the time of making the testament. *Eckert v. Flowry,* 43 Pa. St. (7 Wright) 46; *McMahon v. Ryan,* 20 Pa. (8 Harris) 329.

A person has a right by fair argument or persuasion to induce another to make a will, and even to make it in his favor; and the procuring of a will to be made by such means does not impair its validity. *Blanchard v. Nestle,* 3 Denio, 37; *Lide v. Lide,* 2 Brev. 403.

The only issues involved in this case were: Was Lydia Foster of sound mind and memory at the time she executed her will? and, if so, did she execute the same by reason of undue influence? These being the issues, the court permitted the plaintiff below, time and again, over the objections of the defendants below, to introduce incompetent, irrelevant, immaterial and hearsay testimony, which tended to and did prejudice the substantial rights of the defendants below. The declarations of a party to a deed or will, whether previous or subsequent to its execution, are nothing more than hearsay evidence, and nothing can be more dangerous than the admission of it to destroy the construction of the instrument or to support or destroy its validity. (*Jackson v. Kniffen,* 2 Johns. 31; 5 Pick. 404; 13 Pick. 45.)

*H. T. Green,* for defendant in error:

When a devisee writes the will, it is a circumstance which should excite the suspicion of the court. Redfield on Wills, 106, 109 (note 3), 158; 4 Barb. 393; 17 Barb. 336; 24 Law and Eq. 53; 4 W. Va. 727; 35 N. Y. 595; 18 Pick. 115; 5 Ga. 456; 24 Ga. 325; 46 Mo. 147; 56 Mo. 372.

The plaintiffs in error insist that the declarations of Lydia Foster before and after the signing of the will were not competent evidence. Why? Those made before the will were competent to show that she did not like Dennis Mooney; he was no friend of hers; she feared him; and the other statement, on page 9 of plaintiffs' brief, shows every reason why she would not, if not under duress, have given him anything, she believing that he tried to kill her husband, and while she was helpless his intrusion into her house was enough to arouse her fears and overpower her free will. These declarations, taken in connection with the five hours spent in forcing her to make the will, throw light on the subject, and were competent evidence. (Redfield on Wills, 510, 511, note 2.)

Declarations of deceased persons have been admitted in many cases: *Nash v. Gilmore*, 16 Iowa, 305; *Smith v. Morgan*, 8 Gill (Md.), 133; *Chesholm v. Ben*, 7 B. Mon. 408; 1 Greenl. 349; 5 Greenl. 105; 49 N. H. 230; 28 Ga. 61; 3 Gill & J. 380; Starkie on Ev. *66; Phillips on Ev. (8th ed.), p. 313, note 104.

Evidence of the condition of the testator's mind, both before and after the signing of the will, are admissible for the purpose of shedding light on it: *Davis v. Calvert*, 5 Gill & J. 269–300.

Some fault is found because the judge received the verdict in the absence of the attorneys, after they had consented that the verdict should be received in their absence; but all that did transpire was in the presence of Dennis Mooney, and did not amount to a dictation from the court to the jury. This case is not within the rule in *Usher v. Hiatt*, 18 Kas. 195, nor within that of *Joseph v. National Bank*, 17 Kas. 256.

The questions of undue influence and mental capacity are closely allied. In this case, the question of the capacity of the deceased to make a will is involved; and while the jury have found that she was of sound mind and memory, the evidence fails to convince our mind that the condition of Lydia Foster was such at the time as fills the requirements

of §§ 1 and 2 of our statute on wills, in either sound mind or memory, and requiring the will to be witnessed and acknowledged by the testator. On the question of mental capacity, see 32 Ala. 525; 5 J. J. Marsh. 91; 42 Barb. 274; 21 Vt. 168; 46 Mo. 147; 56 Mo. 372; 62 Ill. 196; 1 Spears (S. C.), 93. See also, Redfield on Wills, 106, 109; 35 N. Y.; 6 Am. Law Reg. 79; 27 Iowa, 110; 33 Ga. 372; 46 Mo.; 62 Barb. 250.

The opinion of the court was delivered by

BREWER, J.: Action to set aside a will; trial by a jury, and verdict against the will. The first matter which we shall notice is the alleged error in the admission of testimony. The will was challenged on the ground of undue influence, as well as on the ground that the decedent, at the time of its execution, was not of sound mind and memory. It appeared that the decedent was taken sick July 3d, and died on the 8th; that Dennis Mooney and Mrs. Mary McCarthy, the principal devisees and legatees under the will, were in attendance upon her during most of this time, and that the will was written the day before her death. Over objection, the court permitted testimony of the conduct of these devisees, not merely at the time of making the will, but also while present at the house of decedent during the sickness and immediately after her death; also, of the statements of the decedent made prior to her sickness, (some a long time prior,) showing estrangement from and ill-feeling toward Dennis Mooney; also, of letters from him to her, tending to show the same state of facts; also, of an engagement of marriage, expected to be consummated on the 10th of July, to one who was present during most of the sickness, and was not mentioned in the will. The testatrix was, at the time of making the will, very much debilitated from loss of blood, and was in what the attendant physician called a semi-comatose state. The preparation of the will lasted some hours, although, when written, the instrument itself fills scarcely a page. As she roused from a state of stupor, she was asked to whom she wished to

give certain property, and her answer noted. It would seem as though, after nearly every answer, she became insensible, and was rallied only by the use of stimulants. When her answers had all been noted in this way, the will was placed in form and her signature affixed, though she was so weak that, after writing her first name, she swooned, and had to be rallied again by the use of restoratives before finishing her signature. Of course, there will always be a doubt whether a will executed under such circumstances really expresses the deliberate purpose and desire of a testator in the distribution of his property; yet mere feebleness and weakness like hers do not of themselves prove fraud or undue influence—they merely show a condition easily accessible to undue influence. The power of resistance is weakened, and the mind yields to fear or pressure which ordinarily would make no impression. The question of undue influence is one of peculiar character; it does not arise until after the death of the one who alone fully knows the influences which have produced the instrument; it does not touch the outward act, the form of the instrument, the signature, the acknowledgment: it enters the shadowy land of the mind in search of its condition and processes. Was the mind strong, or weak? clear of comprehension, or only feebly grasping the facts suggested? Was the will resolute and firm, or enfeebled by disease and bodily weakness? What prompted the making of the will? Was it the thought of the testatrix, or the suggestion of interested parties? What influences were brought to bear to secure its execution, or the disposition of any specific property? These are inquiries always difficult of solution, often made more so by the fact that the parties most competent to give information are the ones most interested to withhold it. To fully inform the jury, they should know the condition of the testatrix's mind at the time of the execution, the circumstances attending the execution, the relations and affections of the testatrix, and such other matters as tend to show what disposition, if in health and

strength, and uninfluenced, she would probably have made of her property. This opens a broad field of inquiry, and gives to such a contest over a will a wider scope of investigation than exists in ordinary litigation. "Put Yourself in His Place," is the title of a recent popular novel, and is appropriate to indicate the scope of such an inquiry. Much of the testimony above referred to was properly admitted as part of the *res gestæ*, as matter surrounding the execution of the will, and properly throwing light upon the mental condition of the testatrix, and the influences under which she was acting. So far as her prior statements are concerned, they were properly admitted, but under a different rule and not as part of the *res gestæ*. It is sometimes broadly stated that the declarations of a testator, whether prior or subsequent to the execution of the will, are inadmissible for the purpose of impeaching it. In a certain sense, this is doubtless true. As a mere matter of impeaching the will, they are hearsay, and inadmissible. They are not like statements of an ancestor in derogation of title or limitation of estate, which, being declarations against interest, are admissible against the heir, for there is no adverse interest in a devisor against the will or the devisee. They are more like declarations of a grantor, after grant in limitation of his grant, and are strictly hearsay. Thus, if a testator, after executing a will, should say that the will was forced from him, or that it was executed against his will and through undue influence, such statement of itself would be hearsay, and inadmissible. (*Jackson v. Kniffen,* 2 Johns. 31; *Stevens v. Vancleve,* 4 Wash. C. C. 265; *Hayes v. West,* 37 Ind. 21.) In the case from 4 Wash., *supra,* Mr. Justice Washington thus stated the law: "The declarations of a party to a deed or will, whether previous or subsequent to its execution, are nothing more than hearsay evidence, and nothing could be more dangerous than the admission of it, to control the construction of the instrument, or to support or destroy its validity."

But while declarations are not admissible as mere impeach-

ment of the validity of a will, they are admissible as evidence of the testator's state of mind. A man's words show his mental condition. It is common to prove insanity by the party's sayings as well as by his acts. One's likes and dislikes, fears and friendships, hopes and intentions, are shown by his utterances. So that it is generally true that whenever a party's state of mind is a subject of inquiry, his declarations are admissible as evidence thereof. In other words, a declaration which is sought as mere evidence of an external fact, and whose force depends upon its credit for truth, is always mere hearsay if not made upon oath, but a declaration which is sought as evidence of what the declarant thought or felt, or of his mental capacity, is of the best kind of evidence. Thus, in the case of *Waterman v. Whitney*, 11 N. Y. 157, which presents a careful analysis of this matter, Mr. Justice Selden says: "The difference is certainly very obvious between receiving the declarations of a testator to prove a distinct external fact, such as duress or fraud for instance, and as evidence merely of the mental condition of the testator. In the former case, it is mere hearsay, and liable to all the objections to which the mere declarations of third persons are subject, while in the latter it is the most direct and appropriate species of evidence. Questions of mental competency and of undue influence belong in this respect to the same class, because, as is said by Jarman in his work on Wills, "The amount of undue influence which will be sufficient to invalidate a will, must, of course, vary with the strength or weakness of the mind of the testator." (1 Jarman, 36.) So the mental strength and condition of the testator is directly in issue in every case of alleged undue influence, and the same evidence is admissible in every such case, as in cases where insanity or absolute incompetency is alleged. And in a later case, *Shailer v. Bumstead et al.*, 99 Mass. 112, Mr. Justice Colt, discussing this matter, says:

"The declaration of the testator accompanying the act,

*Marginal notes:*
1. Declarations of testator, competent evidence of his mental condition.
2. Undue influence; range of inquiry.

must always be resorted to as the most satisfactory evidence to sustain or defend the will whenever this issue is presented. So it is uniformly held that the previous declaration of the testator, offered to prove the mental facts involved, are competent. Intention, purpose, mental peculiarity and condition are mainly ascertained through the medium afforded by the power of language. Statements and declarations, when the state of the mind is the fact to be shown, are therefore received as mental acts or conduct."

Therefore, where, as in a case like this, the circumstances attending the execution raise a doubt as to the mental strength of the testatrix, evidence that the disposition of the property runs along the line of her established friendships and previously-expressed intentions tends strongly against the idea of any undue influence, while evidence that it is contrary to such friendships and intentions makes in favor of improper influences. The testimony of her declarations shows a state of mind unfriendly to one of the principal devisees, and his letters to her indicate a mutual understanding of this estrangement and ill-will. Such estrangement is out of harmony with the recognition in the will. It is not often that a dying person forgets the obligations of kinship and affection, to reward with her property a more distant and unfriendly relative. It may indeed be done, *ex mero motu*, from a heightened and morbidly-active spirit of forgiveness, but as likely through the influences of solicitation, pressure, and fear; and which was in fact the cause, was for the jury, under all the circumstances of the case, to determine. See further in support of the competency of this testimony, *Howell v. Barden*, 3 Dev. 442; *Hester v. Hester*, 4 Dev. 228; *Rambler v. Tryon*, 7 Serg. & R. (Penn.) 90; *Beaubien v. Cicotte*, 12 Mich. 459; *Cawthorn v. Haynes*, 24 Mo. 236; *Davis v. Calvert*, 5 Gill & J. 269.

We pass to a second question upon which counsel place much reliance. The verdict of the jury, as returned to the court, was in the words, to wit:

"*Question 1st:* Was Lydia Foster, at the time the alleged will was made and signed, of sound mind and memory? *Answer:* Yes.

"*Question 2d:* Was it made and signed without undue influence on the part of the defendants or others? *Answer:* No.

"This is the verdict rendered by the jury.

"THOMAS PLOWMAN, *Foreman.*"

On this verdict the court said in substance that the answer entitled the plaintiff below to a general verdict, and the clerk

3. Instructions as to verdict. wrote over the signature of the foreman, with the assent of the jury, the words: "We, the jury, find for the plaintiff." Upon this counsel contend that the court misinterpreted the verdict actually returned, and improperly directed a general verdict for the plaintiff. They say that the jury did not indicate the extent of the undue influence, and that the mere fact of improper influence does not vitiate a will. But the verdict must be taken in connection with the instructions in which the court tells the jury that "the phrase 'undue influence' has a well-defined legal meaning, and may be stated thus: It is that which compels the testator to do that which is against his will, through fear, coercion, or the desire of peace, or some feeling which he is unable to resist." Again, undue influence "must be such as in a measure destroys free agency." These instructions were asked by plaintiffs in error, and they were given. Similar instructions were asked by the plaintiff below, and given, as follows: "Undue influence is anything which either places the party in fear of her life and health, or overpowers her nervous sensibility to such an extent as to deprive her of doing as

4. Definition of a word or phrase; presumption. she desired." With this definition of the words "undue influence," such as to vitiate a will, the jury were bound by the instructions, and are not presumed to have disregarded them in their deliberations on the answers, or the legal meaning of the words thus defined by the court.

Counsel further complain of the manner in which the verdict was received and completed. It appears that when the jury were first sent out for consultation, three questions were submitted to them; that the court sent for them about midnight, in the absence of defendants' counsel, and was informed

that they could not agree upon the answer to the third question, and instructed them that if they could agree upon the answers to the other two, they might let the third question pass; that at eight o'clock the next morning it called them in, and they returned the verdict as above, neither client nor counsel being present, and after its completion discharged the jury without their being polled. But it also appears that the court, before the jury retired in the first instance, instructed them that if they answered all three questions in the affirmative, then the form of their general verdict would be, " We, the jury, find for the defendants;" and also that if they answered any one in the negative, then their verdict must be, " We, the jury, find for the plaintiff;" so that in completing the form of the verdict, and in construing the effect of their answers to the questions, it was only carrying out its previous instructions. It did not attempt in the slightest to dictate their answers or control their judgment, but placed in the form it had previously indicated was proper, the conclusions they had freely reached and returned. In this was no error, but only the due discharge of its duty.

Again, at the close of the afternoon session when the jury retired, it does not appear that the court adjourned to the next morning. On the contrary, the record recites that the court took a recess, and then at midnight called the jury in. The record nowhere shows that the court in any manner misled counsel, or ordered a recess until one hour and then called the jury in at another. For all that appears, the court notified counsel of the time when the recess would end, or it may have itself waited in the court room for some communication from the jury. The fact that no adjournment was ordered, and only a recess taken, was notice to them to remain in attendance and watch the proceedings. And, as the record shows, their client, Dennis Mooney, was present in the court room at midnight when the jury came in. The duration of a session, the time of adjournment and of convening, and the length of any recess, are matters within the discretion of the trial court, and until it appears that such discretion has been

abused, its action is conclusive. No abuse of discretion is shown; none will be presumed.

In reference to the instructions challenged, we remark that some refer to questions which the jury decided in favor of the defendants, and that the others, when construed in connection with the entire charge, would not have misled the jury.

We see nothing in the record to justify a reversal of the judgment, and it will be affirmed.

VALENTINE, J., concurring.

HORTON, C. J., dissenting.