No. 18,714.

CICERO ADOLPHUS HOPPER et al., *Appellants*, v. SARAH
REBECCA SELLERS et al., *Appellees.*

SYLLABUS BY THE COURT.

1. WILL—*Claim of Indebtedness Made in Will—Can Not be Dis-
   puted by Extrinsic Evidence to Enlarge Devise.* A will gave
   the estate of the testatrix to her seven children, share and
   share alike, subject to these conditions and qualifications: The
   testatrix claimed in the will that two sons were indebted to her
   in stated amounts and provided that unless such amounts were.
   paid before her death they should be deducted from the sons'
   portions of the estate. The sons brought suit to set aside the
   will. *Held,* extrinsic evidence was not admissible to dispute
   the claim of indebtedness made in the will and thereby increase
   the shares given to the contestants.

2. SAME—*Mistake of Judgment as to Sons' Indebtedness Does
   Not Show Want of Free Agency.* The will was contested on
   the ground of undue influence. *Held,* the question whether the
   testatrix was wrong in her opinion and judgment respecting
   the indebtedness of her sons had nothing to do with the ques-
   tion whether or not she was a free agent in making the will,
   and that evidence disputing the claim of indebtedness made
   in the will was not material.

3. SAME—*Fraud.* The will was contested on the ground of fraud.
   *Held,* that in the absence of proof connecting the persons.
   charged with the fraud with the making of the will, as in-
   ducing or procuring agencies, evidence disputing the claim of
   indebtedness made in the will was not material.

4. SAME—*Declarations of Stranger to Will Inadmissible.* Dec-
   larations of a stranger to the will and to the action, made
   after the death of the testatrix, tending to show that he pro-
   cured the claim of indebtedness to be inserted in the will, were
   not binding on the contestees and were inadmissible under
   the hearsay rule.

5. SAME—*Conduct of Stranger to Will Inadmissible.* Conduct of
   one who had been the agent of the testatrix in her lifetime in
   looking up evidence relating to the claim of indebtedness in the
   will and entering the items in a book, after the execution of
   the will and after the death of the testatrix, was not binding
   on the contestees, and evidence of such conduct was inad-
   missible to show undue influence and fraud.

Hopper v. Sellers.

Appeal from Pratt district court; PRESTON B. GIL-
LETT, judge. Opinion filed March 7, 1914. Affirmed.

*Frank L. Martin, Van M. Martin,* both of Hutchin-
son, and *R. F. Crick,* of Pratt, for the appellants.

*William Barrett,* and *L. G. Turner,* both of Pratt,
for the appellees.

The opinion of the court was delivered by

BURCH, J.: Mary Ann Hopper died testate in Sep-
tember, 1910. She had seven children, among whom
were two sons, Cicero Adolphus and Moses Gilliam,
and a daughter, Milly J., who was married to E. L.
Pitzer. For a number of years prior to her death she
had made her home with her daughter the greater part
of the time. Her estate consisted of considerable bodies
of land in Harper and Stafford counties. From the
death of her husband in 1893 until April 27, 1909, these
lands were in charge of the two sons, C. A. and M. G.
Hopper. On the date last mentioned Pitzer became
her agent under power of attorney. On May 3, 1909,
Mrs. Hopper duly executed her will, which gave her
estate to her seven children share and share alike, sub-
ject, however, to the following qualifications and pro-
visions:

"Whereas, I claim that my son Cicero Adolphus, is
indebted to me or has converted moneys and properties
to which I am justly entitled in the value of the sum
of $8,000; and that my son Moses Gilliam is indebted
to me in the value of the sum of $7,400. Now, if my
son Cicero Adolphus shall hereinafter pay to me in fact
the said sum of $8,000, so that it may become a part of
my estate, he shall receive a full share of my estate with
his brothers and sisters, but if he does not make such
payment, then the said sum of $8,000 less one-seventh
of the same, shall be deducted from his share of my
estate and added to the shares of his brothers and
sisters mentioned herein. Likewise if my son Moses
Gilliam pays to me in fact the sum of $7,400 so that
the sum may be a part of my estate, then he shall re-

ceive a full share of my estate, but if he neglects and refuses to make such payment, then at my death there shall be deducted from his share of my estate the said sum of $7,400 less one-seventh of the same and the said sum .of $7,400 less one-seventh of the same shall be divided equally among his brothers and sisters mentioned herein.

"This Will shall not prevent me from collecting said sums above referred to of Cicero Adolphus and Moses Gilliam if I wish to do so or see fit to do so, but in case of my death, it shall apply absolutely to their inheritance from me regardless of what .they may say or claim to be the true state of their action or accounts with me."

After the probate of the will the two sons named brought suit to set it aside on the grounds of mental incapacity of the testatrix and undue influence and fraud practiced on her by the Pitzers. At the trial the court availed itself of the advice of a jury. The instructions to the jury on the subject of mental incapacity were adequate and were correct, and the instructions on the subject of undue influence and fraud followed with care the decision in the case of *Ginter v. Ginter*, 79 Kan. 721, 101 Pac. 634. The jury answered questions propounded to them as follows:

"Was the deceased, Mary Ann Hopper, on the 3rd day of May, 1909, at the time the instrument claimed to be her Last Will and Testament, purports to have been made, of such sound mind and memory as to enable her to know and understand the business in which she was engaged and the disposition and manner in which she was willing and disposing of her property?

"She was.

"Was the said instrument made and signed by the said Mary Ann Hopper by reason of undue influence brought to bear upon her by the defendants, Millie J. Pitzer and E. L. Pitzer?

"It was not.

"Was the said instrument made and signed by the said Mary Ann Hopper by reason of fraud practiced upon her by the said Millie J. Pitzer and E. L. Pitzer?

"It was not."

In harmony with these answers the court then found the issues as follows:

"That the paper purporting to be the last will and testament of Mary Ann Hopper, deceased, which was made on the 3rd day of May, 1909, and which has been duly probated in the Probate Court of Pratt County, Kansas, was and is the last will and testament of the said Mary Ann Hopper, deceased; that, at the time of making said will and testament, the said Mary Ann Hopper was of such sound mind and memory as to enable her to know and understand the business in which she was engaged and the disposition and manner in which she was willing and disposing of her property, the claims of those who were entitled to participate in her bounty, and the nature and extent of her property; that the said Mary Ann Hopper was not under any undue influence or restraint whatever, and that no fraud or deception was practiced upon her and that she had full testamentary capacity to make such will."

Judgment was entered accordingly and the contestants appeal.

It is conceded that the finding of mental capacity to make the will is sustained by the evidence. The finding of freedom from undue influence and fraud is not attacked as contrary to the evidence adduced, but the plaintiffs claim they were unduly restricted in making their proof respecting those subjects.

The plaintiffs offered evidence, which was rejected, tending to show that C. A. Hopper was not indebted to his mother beyond the sum of $1600, that M. G. Hopper was not indebted to her at all, and that they were not in default of any settlement with her.

The quoted provisions of the will reduced the share of one son $8000, less one-seventh, and reduced the share of the other son $7400, less one-seventh. Whatever the claims of the testatrix which served as the basis for fixing these amounts, they could not be disputed. Without the declaration of the will that its provisions should stand regardless of what her sons might say respecting the true state of their accounts, she

could give them what she pleased on any consideration she pleased. When she made the will she knew and understood the business in which she was engaged, the manner in which she was disposing of her property, the nature and extent of her estate, and the claims of those who were entitled to participate in her bounty, and it is too elementary to require the citation of authorities that parol evidence can not be employed to contradict or add to or take from plainly expressed provisions of a will. When once fixed by clear recitals of the will the sums to be deducted from the plaintiffs' share of the estate could not be varied by extrinsic evidence of any amount or character. The plaintiffs may feel that it would be to their credit to show that their mother was mistaken. Since, however, she deliberately expressed her conclusion concerning the disputed matter in the will, it can not be made to speak a different language. To do so would be to insert in the will gifts of $8000 and $7400 respectively, which the will expressly withholds.

"Under the rule that parol evidence cannot be employed to vary or add to a will, it is incompetent to show by the declarations of the testator or other extrinsic evidence that the testator has by his own mistake or that of some other person given a legacy of less value or of a different character from that which he in fact actually meant to give." (2 Underhill on The Law of Wills, § 912.)

It was open to the plaintiffs to show that the will was the product of a mind unduly influenced. To do this it was necessary to prove that the testatrix was under such compulsion or coercion as to destroy her free agency, overcome her power of resistance, and oblige her to adopt the will of the Pitzers instead of exercising her own. There is no evidence in the record of this character. The will was drawn by Mr. Houston Whiteside, of Hutchinson, who related the circum-

stances in testimony abstracted by the defendants as
follows:

"That he lives at Hutchinson, Kansas; that he has
lived in Kansas for forty years; that he has lived in
Hutchinson all that time; that he is an attorney at law,
and has been engaged in the practice since 1872.   That,
a few years ago, he practically retired from the prac-
tice of law.   That he was acquainted with Mary A.
Hopper during her lifetime; had known her about
thirty years; that he was acquainted with her hus-
band, W. T. Hopper, and that he became acquainted
with him about the same time; that he got acquainted
with him after he came to Kansas; that he was quite in-
timate with Mr. Hopper, and knew his folks very well;
that they were, in fact, what you might call very good
friends; that he knew the whole family; that he was
distantly related by marriage to W. T. Hopper; that
they claimed kind of a kinship, and probably from the
fact that they were born in the same locality, and had
this connection by marriage of kin-folks, that they
claimed a little kin with each other; that they both
came from the state of Tennessee; that he sometimes
acted in the capacity of an attorney for W. T. Hopper,
and Mary Ann Hopper, but did not represent them
exclusively; that he, at one time, paid a friendly visit
to the Hoppers down in Pratt county; that he drew
the instrument marked 'Exhibit A,' dated the 3d day
of May, 1909; that he remembered the occasion of
drawing the will; that Mr. Pitzer and his wife came
with Mrs. Hopper to his office in Hutchinson; that he
is not quite sure but thinks that they reached the office
in the morning; that he talked with Mrs. Mary Ann
Hopper extensively on that day and that he afterwards
dictated the Will to his Stenographer, Miss Souders.

"Q.   Where did you get the information concerning
the terms of this will, Judge?   A.   I got it from Mrs.
Hopper.

"Q.   I will ask you to state, Judge, as near as you
can, what the conversation was that took place between
you and Mrs. Hopper there?   A.   The parties came to
my office, as I stated and a general conversation ensued
when they first got there as part of the greetings, you
might say, and Mrs. Hopper said to me that she wanted
to see me on a business transaction; on the drawing

up of a will. This was the substance. She then proceeded to state how she wanted the will drawn. She said that her son Bud or Cicero had come into possession of and appropriated property that belonged to her and that in her opinion he was indebted to her in the sum of $8000 but that he would not pay it and she could not get a settlement out of him and she was too old to go to law with him. She wanted to know whether or not this sum that she claimed of him could be inserted in her will, expressed so that unless he paid his part, it would be deducted from his share of the estate, and she also stated that her son, Gilliam, had had the use of property—I think more than one piece of property—but it was a large piece of property in Stafford county, for a number of years, and had paid nothing for the use of it, and that he was indebted to her, in her judgment, $7400.00, and unless he paid this amount to her, she wanted it deducted from his share of the estate, so that she would be just by her other children who did not owe her and who had not obtained property from her and refused to account for it. I told her she could have a will drawn up that way if she wished it done, and she told me that she wanted it done and I drew the will according to her wishes. Now the conversation was quite lengthy and my recollection now is that the dinner hour came on and we adjourned for dinner and met in the afternoon. Whether I dictated this before adjournment or afterwards, I can't remember. In the afternoon the will was read over to Mrs. Hopper and witnessed and attested.

"Q. I will ask you to state if she recollected and called to mind her children that day? A. She spoke of her children and she spoke—seemed to be anxious to convince me that she was not trying to do an injustice to the boys, but wanted to do justice by the other children.

"Q. You may state to the jury whether or not you received any dictation from Mr. and Mrs. Pitzer, on that day, concerning the terms of the will. A. I received no dictation from them. I even do not recollect whether they said a word about the contents of the will or not. I talked with them some when they came in this general conversation and may have addressed them some questions but I have no recollection of doing so. This meeting was somewhat lengthy."

Manifestly the question whether or not the testatrix was mistaken in her opinion and judgment respecting the indebtedness of her sons to her had nothing to do with the question whether or not she was a free agent. If the views expressed to the scrivener and embodied in the will were her own views, it was of no consequence that on a trial the facts might be made to appear otherwise. If she was so far dominated by the Pitzers that she was not a free agent and was compelled to reduce the bequests to her sons because it was the will of the Pitzers and not her own it made no difference what the excuse given for the reduction was or whether the amount were $1 or $10,000.

The stenographer to whom the will was dictated testified that Mr. and Mrs. Pitzer gave directions as to what should be put in the will, and that the testatrix referred to them concerning the indebtedness of the plaintiffs, but she testified that Mr. Whiteside got the facts and information from Mary Ann Hopper, and related no circumstances indicating that the testatrix was under any improper restraint whatever. If this were all the evidence on the subject it would not be sufficient to warrant an inference that the testatrix was overborne and rendered incapable of acting upon her own motives.

"To vitiate a will there must be more than influence. It must be undue influence. To be classed as 'undue,' influence must place the testator in the attitude of saying: 'It is not my will but I must do it.' He must act under such coercion, compulsion or constraint that his own free agency is destroyed. The will or the provision assailed does not truly proceed from him. He becomes the tutored instrument of a dominating mind, which dictates to him what he shall do, compels him to adopt its will instead of exercising his own, and by overcoming his power of resistance impels him to do what he would not have done had he been free from its control." (*Ginter v. Ginter,* 79 Kan. 721, 725, 101 Pac. 634.)

The Pitzers testified that they did not participate in the preparation of the will, and Mr. Whiteside's testimony has been set out at length. The result is that no evidence was either offered or introduced of a character to vitiate the finding that the will was not the product of undue influence.

It was open to the plaintiffs to show that the will was the result of fraud practiced on the testatrix.

Fraud is a species of undue influence, but undue influence may be exercised otherwise than through fraud. If, therefore, the mind of the testatrix was so perverted by deceit or other sinister means that she lacked power to give expression to her true desires, provisions of the will procured by such influences were void notwithstanding the fact that she possessed capacity to make the will and was under no coercion.

"A will procured by lying is no less invalid than a will procured by violence." (1 Underhill on The Law of Wills, § 152, p. 218.)

On this branch of the controversy proof that the claim made by the testatrix against her sons in the will was unfounded might have become relevant. In order, however, to defeat the will on the ground of fraud it was necessary for the plaintiffs to show that the Pitzers made representations to the testatrix concerning the indebtedness of her sons to her, that they knew the representations to be false or made them recklessly, while she was ignorant of their falsity, that the representations were made with the purpose of influencing the testatrix, and that they did in fact influence her to make a testamentary disposition of her property disadvantageous to her sons. The plaintiffs had no proof of this character. They did not examine the Pitzers directly or produce any witnesses who connected the Pitzers with the will as the procuring cause of the provisions in controversy.

The plaintiffs did offer to show, both by cross-examination of Pitzer and by the testimony of other

witnesses, that on two occasions, after the death of Mrs. Hopper, Pitzer made the statement that the claim of indebtedness recited in the will was inserted on information which he obtained from records of mortgages and other instruments and by inquiry from tenants and others, and which he communicated to the testatrix. There are five devisees named in the will, besides the contestants, whose interests were affected. They could not be bound by the declarations of a person who was a stranger both to the will and to the action made after the death of the testatrix, and the offers were properly rejected under the hearsay rule. Declarations of Mrs. Hopper herself that she was unduly influenced or defrauded would have been inadmissible. (*Mooney v. Olsen*, 22 Kan. 69.) The same is true of declarations made by legatees or by executors (1 Underhill on The Law of Wills, § 163), and *a fortiori* of the volunteer statements of strangers.

On cross-examination by the plaintiffs Pitzer was interrogated as follows:

"Q. I will ask you, Mr. Pitzer, if you did not go around over the country in different places and go to the Register of Deeds office and look up lots of different items and enter them up in a book which you had, after the death of Mrs. Hopper? A. After the death of Mrs. Hopper?

"Q. Yes, after the death of Mrs. Hopper."

An objection was interposed and sustained on the ground that the question was not cross-examination. It did not relate to any subject developed by the direct examination and the time fixed was after the death of Mrs. Hopper. Pitzer's conduct after her death could no more bind beneficiaries of the will than his declarations. It is not contended that the purpose of Pitzer's cross-examination was to affect his credibility.

The result is there was no proof that the Pitzers imposed representations of any kind upon the testatrix whereby she was induced to make the will, and whether

the claims of indebtedness recited in it be well founded or not is of no consequence. The plaintiffs might have searched the Pitzers with reference to the origin of the will and the claim of indebtedness which it contains, but they carefully avoided the only legal pathway to that information; and if it had been admitted that the testatrix inserted an untenable claim in her will, fraud upon her and upon the plaintiffs would have been merely a matter of suspicion, conjecture, possibility and guess, which are not enough to overthrow a will. (*Ginter v. Ginter*, 79 Kan. 721, 101 Pac. 634.)

Any burden of proof resting upon Mrs. Pitzer because of the relation of herself and her husband to the testatrix was fully discharged.

With the cause of action to set aside the will was joined another for partition. The plaintiffs were not entitled to a jury trial. The court had full power as an incident to partition to make the sums specified as due from the plaintiffs liens on their shares of the real estate.

The finding of the court on a supplemental issue respecting the amount due from M. G. Hopper as rent is approved. The notice terminating his tenancy was sufficient notwithstanding the misdescription, and the conclusion that the purpose to insist upon an ouster was not relinquished was justified by the facts.

The judgment of the district court is affirmed.