No. 22,934.

MRS. MINNIE HIGBEE et al., *Appellees,* v. MOLLIE E. BLOOM
et al., *Appellants,* et al.

SYLLABUS BY THE COURT.

WILL — *Action to Set Aside — Mental Incapacity — Undue Influence —
Evidence.* In an action to set aside a will on the ground of the mental
incapacity of the testator and alleged undue influence exercised by
his wife, who was the principal beneficiary, findings of fact considered,
and held (following *Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634) in-
sufficient to sustain a judgment setting aside the will on the ground of
undue influence, and *further held* (following *Wisner v. Chandler,* 95
Kan. 36, 147 Pac. 849), that notwithstanding the testator was 76
years of age and suffered through senile dementia, the provisions of
the contested will and the findings showing the circumstances under
which it was dictated and executed, establish the mental capacity of
the testator immediately before and at the time of its execution.

Appeal from Jewell district court; WILLIAM R. MITCHELL,
judge. Opinion filed April 9, 1921. Reversed.

*A. W. Relihan, T. D. Relihan,* both of Smith Center, for the
appellants; *R. M. Pickler,* of Smith Center, of counsel.

*R. W. Turner, D. F. Stanley,* and *D. M. McCarthy,* all of
Mankato, for the appellees.

The opinion of the court was delivered by

PORTER, J.: The action was brought to set aside the last will
of James T. Butler. The plaintiffs are Mrs. Minnie Higbee, a
daughter, George E. Butler, a son, and Earl Worth, a grand-
son, son of a deceased daughter of the testator. The defend-
ants are the beneficiaries under the will, Mollie E. Bloom, a
niece of the testator, her husband, Frank A. Bloom, and Lottie
I. Butler, widow of the testator. It was claimed in the pe-
tition that the testator was of unsound mind and not com-
petent to make a will and further that at the time of the exe-
cution of the instrument he was wholly under the control and
influence of the defendants and had been for a long time pre-
vious thereto, and was induced to make the will by undue in-
fluence of the defendants.

The court made findings of fact and conclusions of law and
held that the will was invalid. The defendants appeal.

The substance of the findings made by the court is: James T. Butler, who died in his 76th year, was an ex-soldier of the Civil war. He was an early settler in Jewell county where he and his first wife, Barbara E. Butler, and their children accumulated most of the property that belonged to him at the time of his death. The property rights of James T. Butler and his first wife, Barbara, were settled in a divorce action brought by the wife in 1906, she receiving as her separate property 200 acres of valuable farm land in Jewell county, her household goods and some other personal property, and a quarter section of land in Trego county. After her death her lands were partitioned. James T. Butler received half, and the other half went to the contestants in this action. The testator had been married three times and Lottie I. Butler was his third wife. She became his housekeeper six or seven years before his death, and was keeping house for him when he was divorced from his second wife, and she continued as his housekeeper until they were married in December, 1916. The value of the estate is about $20,000.

There were no children except by the first marriage. The testator became estranged from Minnie Higbee and George E. Butler by reason of the fact that they gave evidence favorable to their mother in the divorce proceedings in 1906. The testator owned a dwelling house in Formoso, but for several years prior to his death resided at a home belonging to him in Clay Center. Lottie I. Butler was very kind to James T. Butler and carefully looked after all his wants and tenderly cared for him during the last years of his life and especially during the time of his last illness.

In 1918 the testator had a severe attack of Bright's disease and was suffering from a pronounced attack of senile dementia. In July, 1919, he was sick and weak in body and suffering from the advanced stages of senile dementia, at which time he had very pronounced delusions of a persecutory nature and became so mentally deranged that he was not responsible for what he said or did. After his wife had been informed that a complaint would be filed by the officials against her husband on account of his mental condition, she and her husband with an attorney appeared before the probate court on July 14, 1919, and voluntarily agreed that Mr. Butler be sent to the Topeka.

State Hospital.  He was taken there the next day and remained for ten days, when he was discharged at the request of his wife, the certificate of the officials at the hospital stating that he was unimproved.  He returned to his home at Formoso where he remained for a few days with his wife and his niece, Mollie E. Bloom, when he was taken by them to the home of Mrs. Bloom in Hastings, Neb.  He died on September 24, 1919.

During the latter part of his life he changed his attitude towards his children and became reconciled and friendly with them.  He visited at the home of his daughter and was very desirous of seeing and visiting with her and often expressed to his friends a desire to see his daughter and be with her, but the wife would not allow the daughter to come to his home and visit him, and during the last months of his life prevented him and his daughter from being together or talking to each other.

During the last months of his life he stated to many of his friends at various times that his wife was entitled to and should have one-half of his property and that this was his real intention.

On August 12, 1919, the testator requested J. P. Fair, a banker of Mankato, who knew nothing about Butler's mental condition, to come to Formoso for the reason that he had some important business to transact.  Mr. Fair, in compliance with this request, went to Formoso on the evening of the same day, and the testator, in the presence of his wife and Mollie E. Bloom, told Mr. Fair he wanted a will drawn and what disposition he wished to have made of his property.  Mr. Fair made a written memorandum of the disposition the testator desired of his property and returned to Mankato and prepared upon a typewriter the will in question, which two days later he returned to the bank at Formoso, and the assistant cashier of that bank, in company with D. K. Balch and S. D. Blakeley, went to the home of James T. Butler on the evening of August 14, where, in the presence of Mollie E. Bloom and Lottie I. Butler, and in the presence of three witnesses, the instrument in question was read by R. V. Jones to the testator.  After reading the instrument, Mr. Jones asked the testator if this suited him or if it was all right.  The testator replied, "Yes," and signed the instrument in the presence of the attesting

witnesses and while his wife and Mollie E. Bloom were in the room. After signing the instrument he was asked by Mr. Jones if he wished these parties [indicating] to sign as witnesses, to which he replied, "Yes," and they and Mr. Jones signed the instrument as witnesses in the presence of the testator. When R. V. Jones took the instrument to the home of James T. Butler he also, at the request of Mr. Butler or Mrs. Butler, took with him a box belonging to the testator, which was kept in the vaults of the bank. Immediately after the instrument had been attested by the witnesses, either Mollie E. Bloom or Lottie I. Butler procured a key for the box, gave it to James T. Butler and he unlocked the box and began handling the papers it contained, and when he came to the envelope containing the former will his wife said, "There it is, papa," whereupon the testator took the envelope and its contents and tore them in pieces.

During the illness of Mr. Butler in the summer of 1918 his wife often inquired of the attending physician whether in his opinion James T. Butler was able to transact business. The physician replied that he was unable to transact business, but when he was he would let her know. Shortly thereafter James T. Butler, in the presence of his wife and Mrs. Bloom and three other persons who were witnesses, signed a purported will, not knowing at the time what he was signing.

With respect to the will in question, executed on August 14, 1919, the finding of the court was that when it was executed James T. Butler was very sick and very weak in mind and body and by reason of his mental affliction had very little, if any, will power, and was easily influenced by those in whose company he might be, and that he was unduly influenced and induced by his wife to make the instrument, and that the instrument with its various provisions was not the uninfluenced act of his own mind.

As conclusions of law, from the above findings of fact, the court held that the purported last will and testament of the deceased is without force and effect and that James T. Butler died intestate.

Immediately after the announcement of the findings and conclusions of law the defendants filed motions asking for additional findings of fact and conclusions of law and for a modification of some of the findings already made.

Among the additional findings of fact made by the court in response to the request of the defendants were the following:

At the time Minnie Higbee was married, James T. Butler and Barbara Butler deeded to her 80 acres of land in Jewell county, as a wedding present. This occurred seventeen years ago and Minnie Higbee and her husband now live on the land.

By the terms of the alleged will executed in the presence of R. H. McBride, J. M. Livengood and Lottie I. Butler and Mollie E. Bloom, in 1918, Lottie I. Butler was given all of the property of which James T. Butler might die seized after the payment of his just obligations.

Mr. Butler, after his illness in 1918, recovered to such an extent that he was able to travel and transact some business.

After he returned from the hospital at Topeka, and before the 14th day of August, 1919, he had a conversation with a neighbor and friend in which he told him that he had made a will, but was not satisfied with its contents; that he had not given his son, George Butler, anything and ought not to, but, owing to George's condition he thought he would give him something and that George's two sons had fought in the war like he had himself, and that he wanted to remember them; that he intended to make a will. He also stated in the conversation that he had given his daughter, Minnie Higbee, eighty acres of land when she was married and thought he had done enough for her; that he had given his grandson, Earl Worth, some western land, but that he had been good to him and he thought that he was entitled to it; that he wanted to provide well for his wife, that she was entitled to one-half of his property anyway; that if it had not been for her he would have been dead long ago.

At the time the former will was executed a deed to the land in Lane county was executed to Earl Worth, the grandson and one of the plaintiffs herein, and Mr. Butler on many occasions thereafter recognized and spoke of this conveyance having been made by him to Earl Worth.

Mollie E. Bloom never received any compensation for the services rendered by her in nursing, caring for and assisting in caring for the testator.

A large number of additional findings of fact were requested which the court refused to make. A motion to set

aside a number of the original findings was overruled as was the motion for a new trial. These rulings are all assigned as error, and in addition the defendants contend that the findings made by the court compel a judgment upholding the validity of the will.

The will of James T. Butler, omitting the preamble and the first clause, which are purely formal, reads:

"*Second.* It is my will that all my estate, personal, real and mixed of whatsoever kind and wheresoever located except household goods be converted into money and I here direct my said executor to sell said property and give good deed for any real estate of which I may be possessed, and the proceeds from the conversion of my said estate into money be divided as follows, to wit:

"The sum of One Thousand Dollars to be used by my said executor for defraying my funeral expenses and the erection of a monument to my memory.

"*Third.* I give, devise and bequeath to my son George E. Butler One Thousand Dollars . . . to my grandson Fred Butler the son of George E. Butler One Thousand Dollars. . . to my grandchild Benjamin Butler the son of George E. Butler One Thousand Dollars. . . to my niece Mollie E. Bloom One Thousand Dollars. . . . to Frank A. Bloom the husband of my niece Mollie E. Bloom One Thousand Dollars. . . to my grandson Earl Worth a son of my daughter Addie, now deceased Five Hundred Dollars. . . to my daughter Minnie Higbee Ten Dollars. The reason for this small bequest is that I have liberally provided for her during my lifetime.

"I give devise and bequeath to my beloved wife Lottie I. Butler the household goods and the rest and residue of my estate to them and their assigns forever."

The testator appointed J. P. Fair, of Mankato, his executor. The instrument was duly signed by the testator and formally attested by three witnesses.

The petition in most general terms charged that the will was the result of the undue influence exercised over the testator by the defendants. They might have attacked the petition and insisted upon their right to have the pleading set forth the facts upon which this general charge rested, the same as if the action were founded upon a general charge of fraud. They chose, however, as they had the right to do, to join issue upon the general allegation of undue influence; but this did not deprive them of the right to special findings of the facts upon which the court based the general finding that the will was the result of undue influence. Instead of acceding to the re-

quest, the court rested the conclusions of law and the judgment upon a general finding that the testator "was easily influenced by those in whose company he might be" and was "induced to make the instrument . . . by his wife" and that it "was not the uninfluenced act of his own mind." In a supposed case where the cause of action rested upon a general allegation of fraud, a general finding to the effect that defendant was guilty of fraud would not warrant the court in refusing a request to find the facts constituting the fraud. The right to special findings is statutory. (Gen. Stat. 1915, § 7197.)

Within the rule declared in *Nordman v. Johnson,* 94 Kan. 409, 146 Pac. 1125; *Wisner v. Chandler,* 95 Kan. 36, 147 Pac. 849, and *Alexa v. Alexa,* 108 Kan. 38, 193 Pac. 1083, the defendants were entitled to findings as to the kind and character of the acts of undue influence exercised by the wife and particularly the time when such influence was exercised with relation to the time the will was executed. We think they were entitled also to a finding to the effect that the testator without memoranda, aid or assistance from any person stated to J. P. Fair the manner in which he desired to dispose of his property, giving the names of the beneficiaries and the amounts which he desired to leave to each and his reasons for leaving but a nominal sum to his daughter, and further that at the time the will was executed neither the wife nor any person present aided or otherwise took any part in making or influencing the making of the will. Some, if not all of these, were important probative facts about which there was no conflict in the testimony, and they were essential in determining the basis of any general finding of fact or conclusion of law which the court might make.

Under the rule stated in *Lynds v. Van Valkenburg,* 77 Kan. 24, 33, 93 Pac. 615, this court, in reviewing the judgment, is restricted to the will itself and other written documents, admissions of parties, pleadings, depositions and findings of fact, including in the latter, requested findings which we hold the trial court should have made.

It will be observed that no facts are found as to the precise time when any undue influence was exercised and no fact indicating the kind or character of such influence. There is no finding of any act, word or conduct of Lottie I. Butler which

could have had the remotest bearing upon the execution of the will or have influenced the testator during the period he was considering and formulating the terms of the instrument. In *Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634, it was ruled:

"To destroy the validity of a will undue influence must amount to coercion, compulsion or constraint which destroys the testator's free agency and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own. It must be brought to bear directly upon the testamentary act, and particular parties must be benefited or disfavored as the result of the purpose and pressure of the dominating mind." (Syl. ¶ 1.)

There is nothing in any finding showing such coercion, compulsion or restraint as to destroy the testator's own free agency. In *Perkins v. Perkins,* 116 Iowa, 253, 262, quoted with approval in the case just cited, it was said:

"To be undue, within the meaning of the law, influence must be such as subjects the will of the testator to that of the person exercising such influence, and makes the paper express the purpose of such person rather than that of the testator himself. It must be equivalent to moral coercion. . . . And such undue influence must be directly connected with the execution of the will, and operating at the time it was made."

In the opinion in *Ginter v. Ginter,* supra, Mr. Justice Burch made an exhaustive review of the decisions of the courts of this country and of England upon the subject of undue influence affecting testamentary dispositions of property. The opinion quoted the following from *Dean v. Negley,* 41 Pa. St. 312, 316:

"Lawful influence, such as that arising from legitimate family and social relations, must be allowed to produce its natural results, even in influencing last wills. . . . It is only when such influence is unduly exerted over the very act of devising, so as to prevent the will from being truly the act of the testator, that the law condemns it as a vicious element of the testamentary act." (p. 734.)

And again the opinion quotes from *McCulloch v. Campbell,* 49 Ark. 367, 371:

"It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution." (p. 733.)

This court has held that the mere presence of a beneficiary in the room at the time a will was dictated or when it was executed is not sufficient to warrant an inference that the testator was overborne and rendered incapable of acting upon his

Higbee v. Bloom.

own motives. (*Carmen v. Knight*, 85 Kan. 18, 19, 116 Pac. 231; *Hopper v. Sellers*, 91 Kan. 876, 139 Pac. 365.) So, the finding that Lottie I. Butler was present in the room at the time the will was dictated to the scrivener and at the time the will was executed is not sufficient to support a finding that the will was not the free and uninfluenced act of James T. Butler. There is a finding that during the last months of the life of James T. Butler his wife would not permit him to visit his daughter, Minnie Higbee, or permit her to come to his home to visit him, and that whenever she could she prevented them from talking together privately. The daughter is only one of the contestants; there is no finding nor evidence to indicate that Mrs. Butler prevented the son George or his sons, or the grandson, Earl Worth, from visiting her husband or associating with him. Besides, the expressions "during the last months of his life," and "during the latter part of his life," in the absence of any facts showing when the daughter was prevented from visiting and associating with her father, are too indefinite to furnish more than a ground for suspicion and conjecture, which is not sufficient upon which to predicate a charge of undue influence.

"But the courts are unanimous in holding that suspicion, conjecture, possibility or guess that undue influence or fraud has been exercised is not sufficient to sustain a verdict finding such to be the fact." (*Ginter v. Ginter*, supra, p. 739.)

In the present case there is not only an absence of a finding of any specific act on the part of the wife sufficient to base an inference that she exercised any unlawful influence over the mind of her husband which coerced him in making the will, but there is no evidence which would justify such a finding. It has been said:

"The law requires proof of facts, especially when the object is to destroy and set aside an act, apparently deliberate, and executed with all usual and legal formalities." (*Small & als. v. Small*, 4 Maine 220, 224, cited with approval in *Ginter v. Ginter*, supra.)

The specific finding that the instrument was not the uninfluenced act of the testator's own mind; and that he was unduly influenced by his wife in making the will; the refusal to find that at the time the will was executed the testator did not possess sufficient mentality and capacity to make a will, indi-

cate that the court considered the testator's condition of mind and body merely as furnishing a condition rendering him easily susceptible to the undue influence of those in whose company he was when the will was executed.

Symptoms or manifestations of senile dementia are not conclusive of incapacity. In *Wisner v. Chandler*, supra, it was held that:

. "Evidence that a testator clearly manifested the symptoms of senile dementia before a will was made and that afterwards the mental reduction continued until the extreme degree of dementia was reached at the time of his death, which occurred approximately nineteen months later, is not conclusive of incapacity to make the will." (Syl. ¶ 2.)

The court finds that James T. Butler signed a purported will in July, 1918, not knowing at the time what he was signing. This was the will which gave all the testator's property to Lottie I. Butler. If he was incompetent to make the will of July, 1918, he was, of course, incompetent to execute at the same time a deed conveying to the grandson, Earl Worth, one of the contestants, the 160 acres in Trego county; but the grantee has never questioned the validity of that conveyance, nor did James T. Butler in his lifetime; on the contrary, he recognized the validity of the conveyance as appears from the finding which also shows that the testator knew all about the provisions of his first will for he discussed them with his neighbor and friend, Mr. Ault, shortly after his return from the state hospital and but a few days prior to the execution of the second will.

He told Mr. Ault that he had made a will but was not satisfied with its contents; that he had not given his son, George, anything and thought he ought not to, but owing to George's condition he thought he would give him something; that George's two sons had fought in the war like he had himself, and that he wanted to remember them and intended to make a new will. In the same conversation he remembered that he had given his daughter, Minnie Higbee, eighty acres of land when she was married and said that he thought he had done enough for her; that he had given his grandson, Earl Worth, some western land but Earl had been good to him and that he thought he was entitled to the land; that he wanted to provide well for his wife; that she was entitled to one-half of his prop-

erty anyway, and if it had not been for her he would have been dead long ago.

Evidently he had in his mind at that time the provisions of the statute giving the wife one-half of his property in any event.

In *Wisner v. Chandler*, supra, it was said:

"It is proper to consider the provisions of a contested will as bearing upon the mental capacity or incapacity of the testator, and when it is established that a will was the product of the testator's unaided and un-influenced mind, its character may be such that it affords highly satisfying evidence of testamentary capacity although the testator may have been afflicted with senile dementia." (Syl. ¶ 3.)

In order to possess the mental capacity to make a valid will, the law, based upon the experience of mankind and common sense, does not require that the testator possess the ability to manage or carry on a complicated business enterprise. If he possesses the mental capacity to know what property he has, and is able to make a disposition of his property with understanding and reason; knows the persons and objects of his bounty, and their condition and relationship to himself, and is able to dictate the items of the will himself, this is sufficient. It is all the law requires in the absence of undue influence overcoming his mind at the time the will is executed. (*Wisner v. Chandler*, supra, citing *Martin v. Bowdern*, 158 Mo. 379.)

If we apply these principles to the will of August 14, 1919, we find that on its face it stands every test that courts usually apply to the construction of a will; that it is in harmony with the declarations and statements of the testator to his neighbor and friend while he was considering the terms of his will and to the directions which he dictated to the scrivener, apparently without the aid or assistance of any person; that the testator remembered the objects of his bounty, their relationship to him and their condition in life, his previous gifts to some of them, and knew the property he possessed and what disposition he desired made of it.

It is not difficult from the findings to understand the conditions confronting this old man when he approached the end of a long life in which there had been so much family trouble and marital discord; it is not difficult to understand the things that must have counted, the feelings that must have been uppermost in his mind and heart and which really influenced him

to revoke the former will, which gave everything to his wife, and to execute a new one with the provisions just as he dictated them. It would be difficult, however, to set forth these matters more forcibly than they are stated in defendant's brief, from which we quote:

"The execution of the will was but the logical result of his changed perspective. He was growing weary of the long estrangement from his daughter and son. New influences were enkindling a brighter and gentler warmth. The valor of the two soldier boys, the sons of his son, who had 'fought in the war as he had fought' was stirring his pride. He was harkening to the call of the blood. The tendrils of a long neglected love were creeping about his heart, were destroying rancor and obliterating the scars of wounded pride. A desire to be more just and forgiving replaced suspicion and resentment, and the wrath of years did not reach the sundown of the life of the old veteran. The genial influences were reflected in the new will. That instrument was not the product of influence unduly wielded by a designing woman, but the culmination of the unfettered desires of James T. Butler. And on that August day when the will was signed and witnessed the conversation with Ault, his neighbor, received confirmation in every detail, for the will was the reproduction of the picture in the mind of the testator when that talk was had. And the testator doubtless found solace in his last days as the shadows were gathering about him, that all had been remembered—none forgotten."

The judgment is reversed and the cause remanded with directions to enter judgment for the defendants.