No. 24,561.

MARY BARNHILL, *Appellee*, v. JOSEPH MILLER, as Executor, et al.,
*Appellants.*

SYLLABUS BY THE COURT.

1. ACTION TO SET ASIDE WILL—*Motion to Set Aside Verdict and for Judgment
   Notwithstanding the Verdict—Motion Equivalent to Motion for New
   Trial.* A motion to set aside a verdict, and for judgment notwithstanding
   the verdict, for the reason that the verdict is not supported by the evidence,
   is contrary to the evidence, is contrary to the law, and that the records
   of the case disclose that defendants are entitled to judgment in their favor,
   *held,* under the facts in this case, for the purpose of appeal, to be the
   equivalent of a motion for new trial.

2. SAME—*Insufficient Evidence to Support a Judgment Setting Aside a Will.*
   In a suit to set aside a will because of unsoundness of mind of the testator
   and undue influence upon him, the evidence examined, and *held,* insuffi-
   cient to support a verdict and judgment setting the will aside.

Appeal from Montgomery district court; JOSEPH W. HOLDREN, judge.
Opinion filed July 7, 1923. Reversed.

*Sullivan Lomax,* of Cherryvale, for the appellants.
*S. H. Piper,* and *W. B. Grant,* both of Independence, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is a suit to set aside a will. There was a trial
to the court with the aid of a jury, which made special findings of
fact and returned a general verdict for plaintiff. The court ap-
proved the findings of fact and rendered judgment for plaintiff.
Thereafter the defendants filed a motion asking the court to set
aside the answers to the special questions as returned by the jury
and to make answers in opposition thereto, and also filed a mo-
tion for judgment, notwithstanding the general verdict. Both of
these motions were overruled, from which rulings some of the de-
fendants have appealed.

Appellants contend that the court erred in overruling their de-
murrer to the evidence, their motion to set aside special findings
of the jury, and their motion for judgment notwithstanding the
verdict.

Appellee raises the point that the appellants cannot be heard
upon the questions raised by them in this court, for the reason that

no motion for new trial was filed.   The motion filed reads as follows:

"Come now the defendants and move the court for an order herein setting aside the verdict of the jury herein rendered on the 1st day of June, 1922, and render a judgment for the defendants, notwithstanding said verdict, for the reason that said general verdict of the said jury is not supported by the evidence; that the judgment is contrary to the evidence; that the judgment is contrary to law, and that the records herein disclose that said defendants are entitled to a judgment in their favor."

It will be noted that our code does not make the filing of a motion for new trial a prerequisite to an appeal, but does (Civ. Code, § 305) provide for filing such a motion, and this court has repeatedly held that it will not reverse a judgment of the district court for errors occurring during the trial unless the trial court has been given an opportunity to reconsider the evidence and errors complained of by a motion for new trial. (*Doctor v. House,* 30 Kan. 614, 1 Pac. 637; and allied cases.)   But, here the court had an opportunity by the motion filed to review the evidence and the rulings of the court upon the law, and evidently, by the record, did do so to the same extent as though the motion filed had been named a motion for new trial.   The reasons for setting aside the verdict given in this motion are some of the identical reasons which the statute (Civ. Code § 305) provides may be included in a motion for new trial. A pleading in a case is not governed by its name but by its contents.   This motion was, by its contents, a redirecting of the court to the evidence and to the law, and gave him a full opportunity to reëxamine all the questions pertaining to the law and the evidence in the case, and might have been treated by the court as a motion for new trial.   (*Morgan v. Keller,* 194 Mo. 663.)   In this situation it would be highly technical to refuse appellants a hearing in this court because they had not denominated their motion a motion for new trial, and especially in view of section 581 of the code, which requires this court to disregard mere technical errors and irregularities.   We, therefore, hold that, as the court below did have the opportunity to review the evidence and the law, the motion filed by the defendant is, for the purpose of presenting the case here for review, the equivalent of the motion for new trial.

Passing now to the consideration of the case on its merits, several principles of law pertaining to contested wills have been firmly established by former adjudications of this court.   Where a contested

will appears to have been executed and attested in accordance with the statute of wills (Gen. Stat. 1915, § 11753), the law presumes it to be valid. (*Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634.) The time when a will was made is the time of primary importance to be considered in estimating testamentary capacity. (*Wisner v. Chandler,* 95 Kan. 36, 147 Pac. 849). In order to possess the mental capacity to make a valid will the law, based upon the experiences of mankind, does not require the testator to possess the ability to carry on complicated business matters. It is sufficient if he has mental capacity to know what property he has, and is able to make a disposition of it with understanding; that he knows the persons and objects of his bounty, and their condition and relation to him, and that he is able to dictate the terms of the will. (*Higbee v. Bloom,* 108 Kan. 723, 733, 196 Pac. 1080).

Witnesses called for the plaintiff testified in substance as follows: The plaintiff, Mary Barnhill, daughter of testator, fifty-seven years old. The other children being a brother, John, and three sisters, Kate Schultheis, Anna Haynes and Elizabeth Wagner, and two brothers, Joseph and Frank. Frank died thirteen years ago. Committed suicide. When she was a child her parents lived on a farm. Her mother died when she was about twelve or thirteen years old. She was married at the age of sixteen. After that she saw her father only occasionally, perhaps once a year. Her father moved to Cherryvale about 1907. He had two brothers, one of them, Mack, lived with her people for a time on the farm. When she was about eight years old she heard her father tell her mother that Mack was not right-minded. Her first husband's name was Mertz. She was divorced from him and married Barnhill February 8, 1916. Josephine Wilson testified that she lived in Cherryvale; knew the plaintiff some forty years; that the plaintiff worked hard when she lived on a farm as a child. After moving to Cherryvale in the fall of 1917 she met the testator on the street and he did not recognize her and after that she did not bother to make herself known to him. The next spring her father had her call the testator to her home. Her father thought he had a cancer and the testator at one time had a cancer removed. She heard her father ask the testator some questions about the cancer. The testator simply said "uh-huh, uh-huh. Just pushed his hair back; didn't answer any of the three questions." This witness thought testator not competent to make a will. She thought a person to be competent mentally to make a will ought to be

counted by people as bright and brilliant enough to manage things. The testator was eighty-three or eighty-four years old. She saw him frequently pass her house. Nearly always some one was with him. He was naturally a strong-minded man; wanted his own way about things with his home and family; could not be easily persuaded unless he had become weak. Frank Gergen lives in Cherryvale; had lived there about fifty years; knew the testator about twenty or twenty-five years; knew the plaintiff and Mrs. Wagner. Saw the testator frequently during the last four or five years of his life; he had lived by himself for quite a while, and then his daughter, Mrs. Wagner, moved in with him. In the last two or three years of his life when he would meet the testator, sometimes the testator would be very friendly, at other times he would hardly notice him speak; rather the extreme both ways. He thought the testator's mind was not just right. Never talked with him about his family or his property, but believed the testator knew what property he had. Did not know whether testator could make a will or not. "He was off a little." Thought a person to be competent to make a will ought to have his right mind and good health. J. W. Reeves had been a resident of Cherryvale for many years but not intimately acquainted with testator, who was peculiar in that sometimes he would talk a little off so that he could hardly be understood, that is, the witness did not understand his question and could not get the run of his talk. Sometimes his conversation was connected; at other times it was scattered; leave out phrases. Elizabeth Wagner, a daughter of the testator, lived with him two years and nine months before his death. The testator was sick once in a while with spells of asthma and had a little stroke of paralysis in the spring of 1917, but did not know whether that was before he made his will or after. He was not feeble for a man of his age. Anna Haynes, a daughter of testator, testified that her name never was Hayes and that she never had a sister by that name, but that is just the way her father spoke it. Wesley Clark knew testator about nine years; was intimately acquainted with him. The testator came to his house about once a month. He thought he had noticed things about the testator that indicated he was mentally unbalanced. The testator was a great sympathizer with Germany and talked that way. Sometimes he would be talking and would stop and commence talking about his grandchildren. At one time when testator was at the witness's house they started to play the victrola and testator got

Barnhill v. Miller.

up and left. It was the opinion of the witness that testator was not capable of taking care of his business nor of making a will. The time when he noticed the testator acting peculiar was in December, 1919. He could not say whether prior to that time he had ever noticed anything that would indicate that the testator was not capable of making a will.

By the terms of the will the testator left Catherine Schultheis and Mary Merz (Barnhill) one dollar each. To each of his other three children he gave $2,000 and certain real estate in the city of Cherryvale, and to one of those he gave his residence property in Cherryvale. The residue of his property was bequeathed to the Catholic society known as The Propagation of the Faith. The will directed that the executor should act as guardian for the son John, who was described as being in poor health. The inventory of his estate was offered in evidence, which showed about $10,500 cash, besides the real property.

The above is a synopsis of the testimony offered by plaintiff. The defendant's demurrer to this evidence was overruled. It should have been sustained. There is nothing in the evidence which necessarily shows lack of testamentary capacity at the time the will was made, or undue influence. The plaintiff did not testify on either of these points. Josephine Wilson had not seen him for several years until the fall of 1917, six months or more after the will was made. At that time he did not recognize her on the street, but there is nothing especially strange about that. The next spring he did not seem to comprehend some questions asked him by her father. This was more than a year after the will was made. She thought he did not have mental capacity to make a will but her testimony was based upon observations made from six months to a year or more after the will had been executed, and besides that, her idea of testamentary capacity was that a person should be able to be counted by people as bright and brilliant enough to manage things. This is not the test of testamentary capacity. Frank Gergen, who had known the testator for some years, had noticed that in the last year or two, at times, he would be friendly and at times not friendly when the witness met him, rather the extreme both ways. He believed the testator knew what property he had. Did not know whether he could make a will or not; thought he was off a little; thought a person to be competent to make a will ought to have his right mind and good health. Mr. Reeves, who was not intimately

acquainted with testator, said he left out phrases sometimes in his speech and his conversation was not connected and it was difficult to understand. Elizabeth Wagner said the testator was sick once in a while with spells of asthma; that he had a light stroke of paralysis in the spring of 1917. It is not clear whether this was before or after the will was executed. If after, it did not affect his mental capacity at the time the will was made. If before, it evidently was not so severe as to keep him from going alone to the notary's office several times in connection with the making of the will. The will referred to one of his daughters as Anna Hayes. Her correct name was Anna Haynes, but that was the way he pronounced it. He was of German descent and did not speak English well. Wesley Clark knew the testator well. He noticed some peculiarities of the testator in December, 1919, which caused him to think the testator was not capable of taking care of business or of making a will, but that was nearly three years after the will was made. The will referred to the plaintiff as Mary Merz. Her first husband's name was Mertz. At the time the will was made she had been married to Barnhill about a year. This is referred to as indicating that testator did not know his children. It seems that all the parties to this action knew who was meant, and the fact that he referred to her by the name of her first husband, with whom she had lived about fifteen years, instead of by the name of her present husband, does not indicate that he did not know his children. The misspelling of the name was, of course, the fault of the scrivener. There is not a suggestion that indicates undue influence and there is nothing substantial relating to the time that the will was made that indicates a lack of mental capacity.

Defendants then offered evidence tending to show that the will was written in February, 1917. Testator went alone to the office of Hileman, a real-estate man and notary public who had been writing wills for several years, and told Hileman that he wanted to make a will and how he wanted to dispose of his property. Hileman took the memoranda and was to draw the will up, and testator was to return to execute it. He did go back three or four times and talked with Hileman about the will and had some portion of it changed before it was finally executed. No one was with him on any of these occasions. The testator was a German; member of the Catholic church; had lived a widower for many years and always took care of his own business, though of late years he did not attempt

to do much business; only collect his rents and keep most of his money on time deposit. Some ten years before his death he had made a will disposing of his property very nearly equally among his children. There was no evidence that anyone ever talked to him about making a will or how it should be made. At the time the will was made he was living alone, but some time the next month he had his daughter, Mrs. Wagner, move in the house with him. On March 12, 1917, soon after moving in with her father, Mrs. Wagner wrote a sister, "Pa says he has got fifteen years older in the last month. He was just like a child and simply had to give up living alone. Asked us to move in and take care of him. . . . I will let you know if anything changes for the worse." For several years prior to his death he would have sick spells occasionally, but in the main his health was good for a person of his age.

In answer to special questions the jury found that at the time of making the will the testator did not have sufficient mental capacity to know what property he possessed, nor to know the objects of his bounty, nor to whom he was giving his property, and such mental incapacity commenced the last six or seven years of his life. The evidence does not support these findings, but on the contrary shows that he did know what property he had and that he transacted all his own business. His property, outside of his home in town, consisted of cash in the bank, most of which was on time deposit. He talked with the notary about writing the will, mentioned all his children, some of whom the notary did not know, and gave some reasons why he was leaving two of his children out of the benefits of his will. The jury did not find that he was unduly influenced by anyone in making the will.

The judgment of the court below will be reversed, with directions to sustain the demurrer to plaintiff's evidence and render judgment for the defendant.

HARVEY, J. (dissenting): Defendant's motion is not, by its terms, a motion for a new trial. In the court below and in this court they have urged it as a motion for judgment notwithstanding the verdict, and have insisted that it is not a motion for a new trial. In this suit the jury served only in an advisory capacity. The case was tried to the court. Correctly construed, the motion filed by defendants amounted to a request that the court make findings of fact in favor of, and render judgment for, defendants. I cannot

consent to treating it as a motion for new trial over the protest of both the appellants and the appellee, and as it was never so treated in the trial court. Appellants argue that this court can examine the evidence to see whether there is any evidence to sustain the findings of fact and the judgment without a motion for a new trial. In this they are mistaken. In *Kinear v. Guthrie*, 113 Kan. 692, it was held:

"Before a claim that the findings and verdict of the jury are not supported by the evidence can be reviewed on appeal, a motion for a new trial based on that ground must have been presented to the trial court and determined."

In the opinion it is said that this rule has been announced so often that authorities to support it are not necessary, and such has been the uniform rule in this court. (*Huber v. Claudel*, 71 Kan. 441, 80 Pac. 960; *Brubaker v. Brubaker*, 74 Kan. 220, 86 Pac. 455; *Darling v. Railway Co.*, 76 Kan. 893, 94 Pac. 202; *Heinze v. Light Co.*, 81 Kan. 261, 105 Pac. 527.)