No. 32,003

GRACE BRADLEY, EDITH B. CALVERT, GERTRUDE H. KELSEY, ELLA B. HIRT, MADGE LEE, LEE HALDEMAN, BENJAMIN B. ONSTOTT, EMMA S. WILSON, MAY E. ONSTOTT, KATIE MAUDE MATSUO, WILLIAM EDWIN WARNER, JOHN COX WARNER, ROBERT H. HAYNIE and MARY OLIVE TOMPKINS, *Appellants*, v. HARRY T. HILL, THOMAS MURRAY and G. C. TURNER, as Administrators with Will Annexed of the Estate of Charles Abraham Haldeman, Deceased; GRAND LODGE OF KANSAS OF THE INDEPENDENT ORDER OF ODD FELLOWS, and BETHANY METHODIST HOSPITAL, *Appellees*.

(42 P. 2d 580)

Opinion filed April 6, 1935.

*J. Q. Wycoff*, of Garnett, *Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson, Ralph W. Oman*, all of Topeka, and *Alton Gumbiner*, of Kansas City, Mo., for the appellants.

*DeWitt M. Stiles* and *Charles W. Garrison*, both of Garnett, for the appellees.

The opinion of the court was delivered by

HUTCHISON, J.: This was an action by relatives of Charles A. Haldeman, deceased, against the administrators with will annexed of the estate of the deceased and the beneficiaries under the will and codicil of the deceased, to set aside the will and codicil because of the testamentary incapacity of the testator at the times he executed the will and codicil, and because the provisions of the will and codicil are in violation of the rule against perpetuities and restrictions upon alienation.

The will was executed on May 14, 1931, and the codicil on April 29, 1932. The testator died September 4, 1932, at the age of seventy-six. The will and codicil were admitted to probate, and the administrators with the will annexed were appointed by the probate court of Anderson county, Kansas, on September 20, 1932. This action was commenced in the district court of Anderson county on June 6, 1933.

The petition alleged the relation of the plaintiffs to the testator as being, one an adopted sister, five first cousins, one first cousin by marriage and seven second cousins, and that they were the only living relatives of the deceased, who lived and died a bachelor, and that the deceased owned real and personal property in Kansas and real property in Illinois. The petition also pleaded and cited the applicable laws of Illinois, which would apparently exclude the adopted sister from inheritance of lands of the deceased in that state, if he had died intestate, and would apparently have made the cousins eligible to such inheritance.

The petition alleged at great length and in detail the mental and testamentary incapacity of the testator at and prior to the times of making the will and codicil, and also that they were so made and executed as the result of duress, undue influence, coercion and persuasion.

Separate answers, in effect general denials, were filed by the administrators with the will annexed and the two beneficiaries.

The issues were tried by the court without a jury in November, 1933, and a general finding and judgment was by the court rendered on January 5, 1934, in favor of the defendants and against the plaintiffs. After the overruling of the motion of the plaintiffs for a new trial, an appeal was taken by the plaintiffs to this court.

Our attention has not been called to any testimony introduced

by the plaintiffs to show duress, undue influence, coercion or ·persuasion, but a large number of witnesses testified as to the physical and mental condition of the testator, his forgetfulness, his eccentricities and peculiarities. A summary of such testimony can best be stated· by quoting the hypothetical question that was by the plaintiffs asked of two doctors called by plaintiffs as experts. This question was as follows:

"Q. Now, Doctor, speaking of and considering a man about seventy-six years of age and in failing health, and assuming the circumstances and actions hereinafter related to be true, a man who appears to be childish by asking many questions such as a small child would ask of you; delight in showing post cards gathered several years earlier in his travels and talking about them, especially pictures of an obscene nature such as nude women; who had grown so miserly that when the heels of his socks wore out he would turn them over and wear the heels on top of his feet; carrying a heavy grip full of post cards with him on his travels; start a childish conversation with a complete stranger, asking a number of questions; who, while carrying on a correspondence with relatives, claimed he had no relatives; that they were all gone; who refused to permit tenants on his farms to make repairs or improvements of any kind because it would increase his taxes; who sold apples on trees, then forgot the sale and sold them over again; who traded lots for an automobile, then couldn't remember whose automobile it was; who in 1929 or '30 received payment in one check for a note held by him and rental on property rented and could not grasp the simple transaction and required that the check be explained to him several times; who showed the will to parties and insisted that a person would not need to be an Odd Fellow to go to the Odd Fellows home and benefit by the will; who when taking a prospective tenant to a farm to lease land could not find the farm, and when taken on the land insisted it was not his land, although he had owned the farm for some considerable time; who leased land and then would try to rent it to others; who talked and acted in such a manner that laymen whom he came in contact with classed him as being in his dotage; who when getting ready to take a trip would pack and unpack, put things in his bag and take them out and then put them in again; pull down all blinds and tack them down; lock all the inner doors as well as the outer doors; who would not or could not carry on a connected conversation, but would, while talking about something, break right off and start asking questions about something—some other conversation—or start in telling about his travels or some matter foreign to the topic; and who, with no preliminary remarks, in the spring of 1931, stopped a lady on the street and asked would she be afraid to die and told her he would be afraid of the devil; who in conversation would ask the same question over and over again, although already answered, but refused to answer questions himself; who expressed himself as having an extraordinary fear of death; who became lost and could not find his way home in Colony, in the daytime, where he had lived many years and when taken to his home insisted that the house next door was his, and his neighbors and friends had to convince him as to his own home; who became

slovenly and obscene or vulgar in his habits; who became so drowsy in the daytime he would drop off to sleep while reading or while talking to friends, who, many times, would not recognize friends of long standing; who could transact routine simple business, but became befogged or befuddled when attempting to transact business a little out of the ordinary, it requiring much explaining before he would grasp the same; who expressed his wish that he knew how long he was going to live, so he could convert his property into money and burn all of it except what he could use himself; who wrote a will and on the next day had fifty copies of it made and distributed down around in the town where he lived; who visited his friends and kept asking them when they were going to die, and who had arteriosclerosis; the above and foregoing circumstances extending from the—over a period from 1928 or '29 up to his death September 4, 1932. I will ask you, Doctor, in your opinion what was this man's mental condition, or was he afflicted with any known mental disease or disorder?"

Of course this question does not give the intimacy of the witnesses giving such testimony about the testator, but most of them lived in the same town as the testator or in the vicinity thereof, had known the testator for a long time, saw him frequently and had business relations with him. Two of the witnesses were relatives, one living in Illinois, and the other in California. One was a local doctor who gave the testator treatments in December, 1931, for kidney trouble and hardening of the arteries. He did not make a thorough examination of him because he did not seem to want such done. He thought he was mentally defective and eccentric, and the principal thing that made him think so was the way he carried on conversations.

The two expert doctors answered the hypothetical question, above quoted, by giving it as their opinions that the testator was suffering from senile dementia, and then explained the disease by giving symptoms and characteristics thereof. It was said by them to be a progressive and incurable disease, and when the symptoms are developed and observable the patient is not competent to make a will or transact business of any consequence except ordinary routine matters.

It is urged by the appellants that the instances and circumstances given by the appellants' witnesses, other than the doctors, are uncontradicted by the testimony of the defendants, and therefore should be accepted as controlling facts. It is true that no witness of the defendants directly or specifically denied, for example, the statement made by a certain witness for the plaintiffs about the testator being lost, did not know the way to go to his home nor recognize his home when he reached it. A successful defense might be made

without being able to prove such statement to be false and untrue. It is not our duty on review to weigh the evidence pro and con and determine which is the stronger and more convincing, nor to give credence to the testimony of one witness and discredit that of another. Our duty, as is plainly stated by counsel for appellants in a succeeding paragraph of their brief, is to determine whether or not the finding of the trial court that the testator had testamentary capacity when he executed the will and codicil is supported by substantial evidence. To do this we must review and summarize the evidence given in support of such testamentary capacity.

One of the doctors living in the same town who had known the testator since January, 1930, and had treated him when he had a heart attack, said that he stripped him and examined him thoroughly and found him to have a very bad heart; nothing else particularly wrong with him physically; never had any occasion to question his mentality and saw nothing to make him think there was anything wrong with him mentally, and who said he had average intelligence.

Another doctor residing in the same town, who had known him from December, 1930, and had talked to him once about his physical condition, said that he had talked to him occasionally on general subjects and about his travels and never saw or observed anything about him that caused him to think there was anything wrong with him mentally, and so far as he could tell, he was a reasonable, intelligent and shrewd business man.

A banker at Iola, where the testator kept a safety-deposit box, had known him for twelve to fifteen years. He had been a customer of the bank for the last twelve years, and during the last four or five years of his life the banker testified that he had seen him thirty-five or forty times, it would hardly average once a month, and he did not notice any particular change in his mental condition nor any difficulty on his part in understanding business transactions. He talked entirely coherently and connectedly. The witness could not see that he had any trouble in keeping his mind on the business under discussion even in the last few months of his life. The witness saw him about July, 1932, and did not see anything about him to indicate he wasn't all right at that time.

Three parties who lived in or very near the same town in which the testator lived rented land from the testator during the last few years of his life. One testified that he rented land in 1931 and

1932, and that the testator wrote the contracts of leases. The last one was written on March 24, 1932. The witness said he knew the testator all his life and saw him write the contract, and it was not copied from another one. Another renter of land from the testator during the same years, who said he was thirty years of age and had known the testator all the witness' life, testified that he had not noticed any change in him in the last ten or fifteen years, that he seemed to be just as capable of handling his business as ever, nor did he seem to be forgetful. The third renter said he had lived near Colony for thirty-nine years and had known the testator all of his life. He rented land from him in 1931. The contract is in the handwriting of the testator. He said he never had any trouble with the testator over any contract, would see him in town frequently, perhaps once or twice a week for the last few years, and the testator never failed to recognize him.

Another witness, engaged in the lumber business in the same town, knew the testator about forty-five years, saw him often, especially during the last five or ten years of his life, and frequently did business with him by selling him lumber to be used on some of his several farms and lately to build a garage. The witness said he never saw anything about him to cause him to think there was anything wrong with him mentally. He did not notice that he was becoming forgetful, and did not notice any change in his mental state, that his mental condition from time to time, as far as doing business with him, the witness, remained the same over the entire time he knew him. Witness said he did not know of his getting lost in Colony in broad daylight, and never heard about it until he heard it in court; neither did he know about his getting lost and not recognizing his home, and witness had not heard of it before.

Another witness who had been in the garage business in the same town for eleven or twelve years was acquainted with the testator during at least nine of the last years of his life, and sold him an automobile in October, 1931, saw him on an average of two or three time a day as he was going by the garage and had not noticed any change in him. Witness had tried to sell him an automobile for many years past, but testator got rid of him each time by wanting to trade town lots for the automobile. About two weeks before the sale of the automobile to the testator in October, 1931, the testator asked him what he would allow for a certain car for which he, the

testator, had already traded his town lots. Witness made the allowance and testator paid the difference and thus closed the deal. Witness further said he had never noticed any change in the testator and he never knew of his having any difficulty in finding his property.

A husband and wife who lived just across the street from the testator for seventeen years before his death, both testified. The husband said he noticed no change in him during the latter years of his life. He had always thought his conversation was jerky, he would ask a few questions, maybe keep still awhile, maybe talk about something else. That was always his custom and habit of talking as far as he had observed it. He noticed no change in his mental condition in the last two or three years, no difference in his conversation, no difference in his dress or personal appearance or actions around his home, nor any change in his mind that was noticeable. He did not notice any physical decline in him any more than in any other man that was getting older, and was never impressed that there was any mental change. The wife testified that she saw him almost every day and talked with him two or three times a week and noticed no change whatever; he was just as mentally alert a week before he died as he was sixteen or seventeen years before.

Another witness, fifty-two years of age, was acquainted with testator as long as he could remember; he stayed at testator's home two weeks in January, 1930, when testator was ill; talked with him on various subjects; testator took two daily papers and read them. Witness said that testator talked in a connected and intelligent manner. He observed his condition physically from the time he stayed with him and saw him nearly every day and observed no change in his mental condition up to the time of his death. He was just the same in January, 1930, as he was when witness first remembered him, except physically he was slower. He had grown older and slower and was not as strong physically, but there was no change whatever in his mental state in a period of thirty-five or forty years.

A lady, who with her family lived two doors north of testator on the same street for fifteen or sixteen years before he died, said she did not notice any change in his manner of speech or talk in any way. His mind was all right—she would not say perfect.

Another witness who knew testator forty-five or fifty years, talked with him occasionally and saw him nearly every day during the last four or five years, and thought he was weaker physically and getting older, thought his memory was not quite so good; testator had said his memory was not as good, he did not remember like he used to, but witness thought he was as sound a year before he died as he was five years before.

Another witness who lived one block north and across the street from testator and saw him nearly every day for the last twenty-three years, said there was never any noticeable change in his conversation or his mental condition. This continued up to the time of his death. The witness stated he had seen him Saturday evening before he died Sunday morning, and had not noticed any change in his mental condition since he had known him.

Mr. Jones, one of the witnesses to the will, testified that he thought the testator was mentally competent to sign the will and seemed to understand the nature of the business he was transacting. Witness said he heard the testator tell Mr. Stiles, the lawyer writing the will, that he owned land in Kansas and in Illinois, and had $100,000 in government bonds; that he was going soon to Illinois to look after his property there; that he had no relatives but an adopted sister, and said something about wanting to build an Odd Fellows home south and west of Garnett.

Although this evidence is very much in conflict with the evidence offered by the appellants, we have no difficulty in concluding that the finding of the trial court is supported by substantial evidence, and we adhere to the rule stated in *Randall v. Bird*, 118 Kan. 341, 235 Pac. 103, as follows:

"The rule again followed that findings of fact, when sustained by evidence, are conclusive on appeal, although there was evidence on which a contrary finding could have been made." (Syl.)

In *Higbee v. Bloom*, 108 Kan. 723, 196 Pac. 1080, it was said:

"In an action to set aside a will on the ground of the mental incapacity of the testator . . . *held* . . . that notwithstanding the testator was seventy-six years of age and suffered through senile dementia, the provisions of the contested will and the findings showing the circumstances under which it was dictated and executed, establish the mental capacity of the testator immediately before and at the time of its execution." (Syl.)

In *Wisner v. Chandler*, 95 Kan. 36, 147 Pac. 849, it was held:

"Evidence that a testator clearly manifested the symptoms of senile

dementia before a will was made and that afterwards the mental reduction continued until the extreme degree of dementia was reached at the time of his death, which occurred approximately nineteen months later, is not conclusive of incapacity to make the will. (Syl. ¶ 2.)

In *Klose v. Collins*, 137 Kan. 321, 20 P. 2d 494, it was said:

"The fact that the testatrix at an advanced age when she executed a will, was childish, feeble-minded and forgetful, and had never looked after her own business matters herself, is not in and of itself sufficient ordinarily to render her mentally incompetent to make a valid will.

"The extent or degree of mental capacity of a testatrix necessary to make a valid will is to be able to know and understand what property she has, know about her relatives and others who may be the object of her bounty, and be able to direct and make disposition of her property with understanding and reason." (Syl. ¶¶ 2, 3.)

In *Delaney v. City of Salina*, 34 Kan. 532, 9 Pac. 271, it was held:

"The law does not require that a testator shall have absolute soundness of mind in all particulars, but only soundness of mind with regard to the particular matters under consideration; nor does the law require that he shall have the greatest or most perfect capacity of mind, but only such an amount and kind of capacity as will enable him to know what he is doing, the ties of relationship, his obligations to kindred and friends, and to whom he is giving his property." (Syl. ¶ 3. See, also, *Goode v. Cummings*, 115 Kan. 516, 223 Pac. 317; and *Barnhill v. Miller*, 114 Kan. 73, 223 Pac. 317.)

Appellants strongly maintain that the will and codicil are in violation of the rule against perpetuities, that they create a trust for bestowing private charity in the future indefinitely. These are purely law points and depend upon the language of the will and codicil entirely, except for one admitted fact at the time of the trial, which is as follows:

". . . that the rules of the Odd Fellows Home involved in this litigation provide that no one is admissible thereto except Odd Fellows of a certain age who have belonged to that organization for a certain number of years, and widows and orphans or children, the children not being permitted to stay after graduation from high school or after they have passed eighteen years of age."

It is also admitted in the pleadings that the Grand Lodge of Kansas of The Independent Order of Odd Fellows is a corporation organized and existing under the laws of the state of Kansas; and that the defendant Bethany Methodist Hospital is a corporation organized and existing under the laws of the state of Kansas and that its principal place of business is located in Kansas City, Kan.

The preliminary sentence of the will in question is in the ordinary and usual form, and the first paragraph of the will provides for

his burial and the erection of a suitable monument. The last sentence of the will relates to the testator's desire prior to his death to erect a home on his farm for old folks to be under the supervision of the Grand Lodge of the Independent Order of Odd Fellows of Kansas, which home it is admitted was not erected prior to his death.

The second paragraph of the will calling for a construction is as follows:

"SECOND: Having no immediate family except an adopted sister who has sufficient property of her own and is not in need of any part of my estate, and having been for more than thirty (30) years a member of the Independent Order of Odd Fellows, and believing that said Independent Order of Odd Fellows can make proper use of my property for the benefit of my brothers in said order, their widows and orphans, I do hereby give, devise and bequeath unto the Grand Lodge of Kansas of the Independent Order of Odd Fellows, all my property of every kind and nature, real, personal and mixed, and wherever situated after the payment of my debts, burial expenses and the provisions of the first paragraph of this will have been all taken care of, to be held by said Grand Lodge of Independent Order of Odd Fellows of the state of Kansas, for use only in maintaining the Old Folks Home for Odd Fellows now being operated by said Grand Lodge and for the building of such additions, annexes or branches thereof as the proper officers of said Grand Lodge may determine upon and for the aid and assistance of needy Odd Fellows, their widows and orphans.

"It is my desire that such real estate as I may leave be held and the income only therefrom used for the purposes above directed so long as it is practicable to do so . . ."

The portion of the codicil calling for a legal construction is as follows:

"I hereby give, devise and bequeath to Bethany Methodist Hospital, a corporation of Kansas City, Kan., for the care and treatment of crippled children, the following-described real estate situated in Macon county, state of Illinois, to wit:

"The northeast fractional quarter of section seventeen (17), township eighteen (18), range three (3) east, containing 159 acres, more or less.

"The said Bethany Methodist Hospital to receive the above-described real estate in fee simple, they to have full right to use said real estate or dispose of it in any manner which in the judgment of the board of trustees of the said Bethany Methodist Hospital shall be for the best interest of the said Bethany Methodist Hospital in the care and treatment of crippled children."

Appellants call attention to the following expressions in the will to show that a trust was created thereby, first where he states that he believes that the Odd Fellows can make "proper use of my property for the benefit of my brothers in said order, their widows and

orphans." Again where he says it is "to be held" by the Odd Fellows Grand Lodge "for use only in maintaining" the old folks' home, and, lastly, where he states it is my desire that such real estate as I may leave "be held" and the "income only therefrom used for the purposes above directed" so long as it is practicable to do so.

Do these expressions in connection with the rest of the language of the will create a trust? Appellants remind us of it being said in section 36 (2), Tentative Draft No. 1, Restatement, Trusts, page 79, that "No particular form of words or conduct is necessary for the manifestation of intention to create a trust." In most definitions of trusts the legal estate must necessarily be in one and the equitable estate in another. (26 R. C. L. 1168.) In 69 C. J. 710, 711, it is said:

"In order to create a trust by will the intention of the testator must be manifest and mandatory. . . . The fact that the testator designated the purpose for which a legacy must be used does not necessarily indicate an intention to create a trust. . . . Where a will leaves it doubtful whether it was intended to encumber a gift with a trust, or in any way restrict it, the construction most favorable to the beneficiary will be adopted. Thus the mere expression of a belief that the devisee will do justice with regard to certain persons, of a desire that a certain disposition of the property should be made by the beneficiary, of an expectation that the testator's wishes would be followed, of certainty that the beneficiary would aid the testator's relatives in case of need, or of a suggestion that the property bestowed be used for certain purposes, does not necessarily indicate an intention to create a trust."

Also, in the same volume, at page 713 it is said:

"Where a gift is made to a certain corporation or association, which is charged under the will to use it for certain purposes, for the accomplishment of which the corporation or association was formed, the gift is construed as absolute, and not in trust, and this has been held to be true even though the devise is technically in the form of a trust. The same is true in the case of a gift to a corporation or association for the benefit of one of its existing departments, or for the benefit of a department to be created."

It does not seem that the words emphasized above are strong enough or definite enough to show an intention on the part of the testator to create a trust. However, this preliminary question of trust, as well as the other preliminary distinction made in this case between public and private charities, are pertinent only in so far as they affect the ultimate question in this case as to the will or codicil violating the rule against perpetuities. Appellants cite the case of *Troutman v. DeBoissiere,* 66 Kan. 1, 71 Pac. 286, as sustaining their contention. In that case a trust deed, instead of a will, was the

document under consideration. This instrument was entitled "Deed of Trust." The second parties were designated therein as trustees for the third party, "The DeBoissiere Odd Fellows' Orphans' Home and Industrial School Association, of Kansas," and it was there held because the gift was to provide a home and school for the maintenance and education of the children of the deceased members of a secret society it was not a gift for purposes of a public charity and was void as against the rule prohibiting perpetuities of titles in estates.

The case of *Washburn College v. O'Hara*, 75 Kan. 700, 90 Pac. 234, is also cited along the same line. In that case a benevolent gentleman gave to the trustees of Washburn College, by will, the residue of his estate, the annual interest of which was to be used for higher education (mainly) of young men for the Christian ministry, with many restrictions as to the conduct and habits of the young men and their being members of some Christian church and not members of any oath-bound secret society, with a preference to be given to his own grandchildren and great grandchildren, and it was held that such bequest created an educational trust, which is a public charity.

Another Kansas case cited by appellants is *Treadwell v. Beebe*, 107 Kan. 31, 190 Pac. 768, where the testator named a trustee and directed him to pay to the city of Anthony, in trust, certain property to be held by said city and to be by it invested and the net proceeds to be used for the purpose of buying food and fuel for needy and deserving persons residing in the city for six months or more, and it was there held to be a public charity and that the municipality had authority to administer it in perpetuity.

In one of the most recent opinions, written by Mr. Justice Mason, *Malmquist v. Detar*, 123 Kan. 384, 255 Pac. 42, it was said on page 385:

"The rule against perpetuities has to do with the beginning of estates, and its object is to restrain the creation of future conditional interests. (Gray, The Rule Against Perpetuities, 3d ed., § 595.)"

In *Clark v. Watkins*, 130 Kan. 549, 287 Pac. 244, it was held:

"A Masonic lodge, a charitable and benevolent organization, is capable of becoming the beneficiary under a will and of the devotion of the property received to charitable uses." (Syl. ¶ 1.)

It is said in 5 R. C. L. 315:

"There is a broad distinction between a gift direct to a charity or charitable

institution already established and a gift to a trustee to be by him applied to a charity. In the first case the court has only to give the fund to the charitable institution, which is merely a ministerial or prerogative act; but in the latter case the court has jurisdiction of the trustee, as it has over all trustees, to see that he does not commit a breach of his trust, or apply the funds in bad faith to purposes foreign to the charity. Gifts to religious and charitable corporations to aid in carrying out the purposes for which they are organized, whether by expending the principal of a bequest or the income of a bequest to be invested in perpetuity, do not create a trust in any legal sense, do not offend against the statutes of perpetuities, and are not to be judged by any of the well-known rules pertaining to the law of trusts as applied to private individuals."

In 48 C. J. 952 it is said:

"The rule against perpetuities, which by its express terms relates to interests and estates that may not vest within the period therein specified, has no application to present interests, legal or equitable, in realty or personalty, whether alienable or not.

"Present gifts of real or personal estates to be devoted to charitable uses commencing *in præsenti* are often supported as a supposed exception to the rule against perpetuities. It would seem, however, that they are properly regarded as present interests, vested in the charitable institution, and consequently not within the scope of the rule."

In the same volume, at page 986, it is said:

"Trusts for charitable uses commencing *in præsenti* or within the period of the rule against perpetuities are not obnoxious to the rule, although they may continue forever and beneficial interests may arise under them at a remote time, so long as the property given in trust vests in the trustee immediately or within the period prescribed by the rule, even though the payment or application to the designated uses may be postponed."

We conclude that neither the will nor the codicil in this case creates a trust, and the beneficiaries under both instruments are capable of receiving and devoting the gifts to charitable uses, even if such uses may not be definitely classed as purely public charities. And because the gifts commence *in præsenti*, the title vests at once and the right of alienation is not postponed or restrained by future conditional interests under either document, the rule against perpetuities is not violated, and therefore both will and codicil are valid.

The judgment is affirmed.