No. 41,464

In the Matter of the Estate of Carrie E. Millar, Deceased. (BILLY MILLAR KRATZER and LOIS ALLEN, *Appellants,* v. L. H. MOORE, Executor of the estate of Carrie E. Millar, deceased, *Appellee.*)

(345 P. 2d 1033)

Opinion filed November 7, 1959.

*C. H. Morris,* of Wichita, argued the cause, and *Robert F. Bailey,* also of Wichita, was with him on the brief for appellants.

*George Barrett,* of Pratt, argued the cause, and *Richard Barrett,* also of Pratt, was with him on the brief for appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action in which the heirs are attacking the validity of a will on the ground that the testatrix was mentally incompetent to make a will and the codicils thereto. Appeal has been duly perfected from an order of the district court upholding the admission of the will to probate and from an order overruling the appellants' motion for a new trial.

The question presented is whether the appellants were denied a fair trial, either by the exclusion of evidence or by rejecting the testimony of a psychiatrist in finding against the appellants, which they contend was by reason of prejudicial personal beliefs and feelings of the trial judge and contrary to reliable scientific evidence.

The instrument in question purporting to be the last will and testament of Carrie E. Millar, deceased, consists of the will proper which was executed May 5, 1945, and two codicils thereto, one executed August 15, 1952, and the other executed May 23, 1957.

The appellants, Billy Millar Kratzer and Lois Allen, were the sole and only children of Cyrus Millar and Goldie Millar. Cyrus Millar was the sole and only child of Carrie E. Millar, the testatrix herein, and William (Billy) Millar, who died in 1940 leaving a sizeable estate to his widow, Carrie E. Millar, as sole beneficiary. Cyrus Millar and Goldie Millar were divorced in May, 1945, and in 1947 Cyrus died leaving a will, which was executed May 5, 1945, leaving a sizeable estate to his mother, Carrie E. Millar. The appellants herein contested their father's will, but were unsuccessful, the matter having been considered by this court in *In re Estate of Millar,* 167 Kan. 455, 207 P. 2d 483.

Carrie E. Millar never remarried after the death of William Millar in 1940 and lived alone in the family home at Pratt, Kansas, until her death on the 15th day of September, 1957. She left an estate consisting of extensive holdings of real property, corporate stocks, bonds, notes, mortgages, cash and other personal property of the appraised value of $265,659.09.

· Throughout the years from 1945 until the date of her death she looked after her properties with the assistance of her attorney, George Barrett, her banker and friends. She received constant medical attention and when she signed the second codicil on May 23, 1957, she was in her eighties. Carrie E. Millar was eighty-six years of age when she died.

On the 18th day of October, 1957, the probate court of Pratt County, Kansas, entered an order admitting the last will and testament of Carrie E. Millar, deceased, to probate and declaring said last will and testament to be valid. On appeal from the above order to the district court of Pratt County, Kansas, the matter of Carrie E. Millar's mental competence was tried *de novo*. The appellee, L. H. Moore, executor of the estate of Carrie E. Millar, deceased, in propounding the will presented fourteen witnesses who testified as to the mental competency of the testatrix. Among these witnesses was an osteopathic physician who had practiced in Pratt County for fifty years and treated the testatrix for more than twenty-five years, two practicing physicians and general surgeons who had attended the testatrix, one having known her since 1931 and having had many contacts with her as an individual and in a professional capacity during the years, and the other having known her as a patient since May, 1952. Others included a legal secretary, a banker, an insurance broker, a graduate nurse, and neighbors from the vicinity of the Millar ranch in Kiowa County, Kansas, who had known the testatrix for many years.

The substance of the testimony given by these witnesses, if taken as true, established the requirements of mental capacity to make a valid will frequently applied by this court—that the testatrix was able to know and understand what property she had, know about her relatives and others who may be the objects of her bounty, and their condition and relation to her, and was able to direct and make disposition of her property with understanding and reason. (*Hudson v. Hughan,* 56 Kan. 152, 42 Pac. 701; *Barnhill v. Miller,* 114 Kan. 73, 217 Pac. 274; *Klose v. Collins,* 137 Kan. 321, 20 P. 2d 494; *Stayton v. Stayton,* 148 Kan. 172, 81 P. 2d 1; and *In re Estate of Ellis,* 168 Kan. 11, 210 P. 2d 417.) In the opinion of these witnesses, the testatrix had full mental capacity at the time she executed her will and the codicils thereto. She was described as a strong-minded woman not easily influenced.

The appellants took the position that the decedent was greatly

advanced in age and infirm of mind and body and was incapable of and did not know and understand the extent and value of her property, the natural objects of her bounty and the meaning and purport of the instruments which she executed. They contended that at the time she executed the will and codicils thereto she was suffering from neuropsychiatric syndromes that gave her a sick mind and complete deterioration of mind, body and emotions; that she was influenced by untrue and imaginary beliefs and thoughts which had no basis in fact concerning her sole and only grandchildren, appellants herein, and their natural claim upon her property as natural objects of her bounty.

At this point it should be stated the testatrix left no property or money to her granddaughters, the appellants herein, who were her sole and only heirs at law. Except for a few minor bequests of money, taking the size of her estate into account, she left the home in Pratt together with the sum of $10,000 to the "Library Board of the City of Pratt, Kansas, and/or the City of Pratt, Kansas," with directions that the structure be known as "the William C. Millar Memorial," and the remainder of her estate in trust for the benefit of the "Library Board of the City of Pratt, Kansas, and/or the City of Pratt, Kansas," as a further contribution to the maintenance of the public library of the City of Pratt, Kansas.

The appellants' evidence as to incompetency of the deceased to make the will and respective codicils in question was the opinion testimony of an experienced psychiatrist and neurologist, Dr. Frank H. Harris, M. D., of Wichita, Kansas. Dr. Harris had never seen the testatrix during her lifetime and was presented as a qualified and experienced psychiatrist and neurologist, who had carried on an extensive practice in determining within reasonable medical certainty the competency or incompetency of a person after death, without having previously treated or observed such person prior to death. The appellants' theory of the case was that "a competent medical trained practitioner in the field of psychiatry can determine the mental competency or incompetency of an individual after death when they have not had occasion to treat or see the person prior to death. And that the diagnostic aids of doing that is to obtain information of all the things in the background, the life and history of the person that they are trying to determine competency after death."

Pursuant to this theory the appellants sought to introduce in evidence before the trial court the life history of the testatrix.

The first question presented by the appellants is that the trial court excluded medical evidence which denied the appellants a fair trial.

It would be impossible to disclose just what testimony the trial court did exclude without incorporating verbatim practically the entire abstract of the testimony in this case. Suffice it to say, the appellants assigned the exclusion of evidence as one of their grounds in the motion for a new trial, however, at the hearing on the motion for a new trial they did not produce the evidence which they contend was excluded improperly. This question is therefore not here for review. (G. S. 1949, 60-3004.) It has been repeatedly held that where the ground of the motion for a new trial is error in the exclusion of evidence, the excluded evidence must be produced at the hearing of the motion for a new trial. (*Mohr v. Women's Benefit Ass'n.*, 134 Kan. 311, 5 P. 2d 789, and cases cited under the section of the foregoing statute.) In passing it may be said the appellants sought to rehash the evidence of the entire divorce proceedings between Cyrus and his wife and the court proceedings concerning the contest of Cyrus' will, both of which the trial court excluded. It has been held that a wide range of testimony is allowed in cases involving mental capacity, and, as a general rule, any and all conduct of the one whose sanity is in question is admissible in evidence. *Kempf v. Koppa*, 74 Kan. 153, 85 Pac. 806.) Whether the excluded evidence was material is not shown by the record, it not having been produced at the hearing of the motion for a new trial.

Appellants contend the record strongly indicates the trial court at no time fully comprehended appellants' theory of the decedent's inability to make a valid will because of a special mental condition or disease, classified as a neuropsychiatric syndrome and paranoid personality. This leads to the next question presented.

After all of the testimony concerning the history of the testatrix' life was in, including the cross examination of appellee's witnesses and the testimony given by the appellants and various witnesses called on their behalf, counsel for the appellants qualified Dr. Harris as a specialist in psychiatry and neurology and then put a hypothetical question to him consisting of approximately twenty-seven hundred words. This question attempted to review the history of the testatrix' life as disclosed by the evidence before the trial court.

Dr. Harris, after stating that he had formulated an opinion concerning the testatrix' mental capacity, answered as follows:

"In my opinion, this woman, and I am taking into consideration what I have heard in court, having treated or having knowledge of Billy Millar, and also having read some other records that this woman was a paranoid personality and that was characterized by, One: The rejection of her granddaughters and also the rejection of her own son. If you will go back in the records, I think that will be shown. Two: Her feeling of wanting to possess everybody. She wanted to possess her lawyer, she wanted to possess her banker, and she wanted to possess everybody. She wanted to make them dangle at the end of the string. This woman was insecure. That was her paranoid way of getting back at people. She had them do her bidding at her will. She was very suspicious, again part of her paranoid feeling. I am sure when she submitted a bill she had to have everything itemized and then she would quibble about various things on that bill. She was very suspicious that somebody was trying to take something from her. Three: There is the problem of insight and judgment. She had good judgment probably when it came to business. She had good judgment when it came to certain parts of her mental life but when it came to her own family, her relatives, her judgment was poor, her insight was poor. You in no way could convince this woman that she was wrong in her feelings towards her own granddaughters, regardless of what she felt about their mother, so the insight which is a very significant part of an individual's mental capacity was poor. And judgment in regard to these people was poor. She was able to know her property but proper distribution, to leave it to her own children, she had no conception of that judgment of what to do with it because there was this paranoid feeling towards these two people."

Dr. Harris then further testified that in his opinion the testatrix had knowledge and understanding of what properties she had; that she knew the granddaughters, appellants herein, were the natural objects of her bounty but that she was unable to make a disposition of her property by will with understanding and reasoning because her insight and her judgment at the time she executed the various instruments in question and for quite a long time had been impaired by reason of her paranoid personality. He further related that it was possible for him to reach a conclusion such as the opinion stated in his testimony, upon the evidence presented to him in the hypothetical question, without treating or seeing the patient ahead of time.

Upon cross examination Dr. Harris was asked to state upon what evidence he determined that the testatrix rejected her son, Cyrus. He answered by saying that the testatrix did not want the son to get married because she wanted to possess him. He then went beyond the record to state that Cyrus had several other girl

friends but the testatrix stopped their marriage. He related that he obtained this information from some people whom he contacted and some evidence he had in the office, and not from the court-room. Counsel for the appellee moved to strike the doctor's testi-mony, whereupon Dr. Harris, pursuant to interrogation by counsel for the appellants, disclosed that no other extraneous evidence, beyond what he stated, was considered in his opinion and that even excluding such evidence his opinion would be the same. The trial court thus permitted his testimony to stand.

The trial court found that the decedent, Carrie E. Millar, at the time she made her will and the two codicils thereto, "was fully competent and mentally alert enough to know the property which she owned, the objects of her bounty, and be able to make a reason-able, sensible disposition of it" and by his ruling affirmed the order of the probate court admitting the will and the two codicils thereto to probate.

The second question presented by the appellants' brief is: "Were the findings of fact and judgment of the trial court rendered under the influence of prejudicial personal beliefs and feelings of the court and contrary to reliable scientific evidence so as to deny to the appellants a fair trial?"

At the conclusion of the trial the judge made rather extensive remarks consisting of his findings and judgment. Among these remarks he said:

" . . . Now, of course, the objectors here rely upon the evidence of the psychiatrist. Well, I hope that I am not prejudiced against psychiatry . . ."

Appellants conclude from the foregoing remarks that the trial judge was prejudiced, or at least sufficiently prejudiced so as to deny them a fair and impartial trial. It is clear that a court must be fair and impartial when the court is trying a fact case without a jury. (*Harrison v. Harrison*, 48 Kan. 443, 29 Pac. 572.)

The law is settled in this jurisdiction that nonexpert testimony is competent on the question of mental capacity, and the trier of the facts is not bound to adopt the views and opinions of a physician, qualified as an expert in psychiatry and neurology, to the exclusion of other nonexpert testimony. (*Mingle v. Hubbard*, 131 Kan. 844, 293 Pac. 513; and *In re Estate of Millar*, 167 Kan. 455, 207 P. 2d 483.) Furthermore, the opinions of medical men, who have only normal school training in psychiatry without being specialists in

the field, are admissible in evidence as to the mental capacity of a person at a particular time, because they are supposed to have become, by study and experience, familiar with symptoms of mental disease, and therefore qualified to assist the court or jury in reaching a correct conclusion. Such opinions of medical doctors may be based upon facts within their personal knowledge, gained from actual examination or observation, as well as upon a hypothetical case disclosed by the testimony of others. (*Stayton v. Stayton,* supra.) While the physicians in the instant case who attended the testatrix during her lifetime and testified for the appellee were not specialized in psychiatry and neurology, as was Dr. Harris, they were none the less in the category of expert witnesses.

The appellants contend the remarks of the trial judge indicate that the trial judge decided the case upon his own meager knowledge of psychiatry, and *disregarded* entirely the testimony of Dr. Harris, thereby denying them a fair and impartial trial.

While the trier of the facts might under some circumstances *reject* expert testimony absolutely, depending upon the circumstances, and give it no weight because it is believed to be least worthy of credit, it does not follow that such expert testimony can be *disregarded.* (*Forsyth v. Church,* 141 Kan. 687, 42 P. 2d 975.)

In our opinion the above quoted remarks of the trial judge appear to be relatively insignificant when considered in the light of other remarks made in connection therewith. Pertinent portions of the statement made by the trial judge are:

". . . It [the question] is whether or not the decedent in this case had a right to believe certain ways and had a right to indulge certain prejudices which she had. No doubt she had certain prejudices, but who can say that they were not or that they were entirely without reason or that they went to the extent of becoming insane delusions? I don't think we could say that at all. I think the evidence falls far short of that. This woman had an only son and no doubt she had great ambitions for that son. Perhaps she was possessive to some extent. Perhaps she did seek to control his life to a greater extent than most mothers do or she should have done, but that is quite common. So, he goes out and marries a girl—selects a wife and marries her and that didn't suit the mother very well and so it is to be expected that in a year or two or three these girls came along. The mother was still possessive and still craving the love and affection of her only son and perhaps these girls tended to take some of their father's love and devotion way from the mother which was only natural, but the mother didn't take kindly to it and she went along and she didn't overcome that as years went along, that motherly, overly possessive feeling that she had. In fact, as years set upon

her it may have increased and then the divorce between the son and his wife came and it just tended further to confirm her judgment that the marriage had been wrong, and she naturally took her son's part. She was already turned against the daughter-in-law and somewhat prejudiced against her granddaughters and so this prejudice becomes greater. Maybe if the girls could now look back and see how they might have catered more to their grandmother and had used greater diplomacy and bowed before her, they might have overcome some of this, but they were also individualists and they didn't see fit to do that and they can't be blamed for that. So, events run along until the time when their grandmother got to thinking of the disposal of this property. After the divorce and the son got whatever he got out of it, and he naturally was embittered at the girl's mother and whatever the facts are as between the father and these girls or whatever the rights and so on are concerned, the father may have been somewhat dominated by his mother. I don't know. Anyhow, he saw fit to disinherit the girls, which he had a right to do, whether it was the proper thing to do or not. Under the law he was the sole judge and all his property went to his mother; and in a few years it became necessary for her to make a will and dispose of this property, and she seeks an outlet for these biases and prejudices and feelings that she has carried during the years. The library here for some reason or other, which the evidence does not disclose entirely, appealed to her so she made the provision for the library. Now, it may be somewhat unnatural for the grandmother to just utterly forget her grandchildren. It may seem harsh and cruel that her own flesh and blood are left out. Yet, it was her privilege to do whatever she saw fit to do and she did. She made this will. I think the overwhelming evidence here is in support of the will and the testatrix' competency to make the will. I can't get away from the fact that all these lay witnesses that have come in here with their knowledge of the testatrix which they have disclosed and who were perfectly competent to pass upon the competency of this woman and to know what her mental abilities were. It has been pointed out here that she knew of the property she had; that she knew of her family and the natural objects of her bounty. There is no doubt but that she knew and had the ability to make a reasonable disposition of that property according to the dictates of her own conscience and that I think she did. Now, of course, the objectors here rely upon the evidence of the psychiatrist. *Well, I hope that I am not prejudiced against psychiatry.* I believe it has a place in medical science. I think it also has a place in the jurisprudence of our country. I don't think it should be discarded lightly, but under the facts of this case and with my meager knowledge of psychiatry, I am rather disappointed in Dr. Harris. I listened to certain testimony here and particularly the question that was put to him by counsel for the objectors and then heard the definite fixed opinion that this woman was a paranoid. I rather expect more from a psychiatrist than that; that he would see the possibilities on the other side also. I think it might apply to certain individuals, that he might be able to tell, but if I should accept the testimony of Dr. Harris in the light of all the other testimony in this case, I would be very very fearful that I would put upon the auction block every last will and testament that might be made in this county or any other county in the district for years to come,

if this will could be determined by the mental analysis of a psychiatrist. I am unwilling to go even part way on that. I still think that in many respects that the lay witness comes nearer to analyzing his neighbor's mind than perhaps a trained mental student or psychiatrist could because human nature is so different and it varies with all persons and to take one rule out of a book and say that if you come within that rule, you are a paranoid and incompetent, why, I cannot go along with it." (Emphasis added.)

No doubt some of the remarks of the trial judge were prompted by testimony elicited from Dr. Harris on cross examination by counsel for the appellee as follows:

"Q. (By Mr. Barrett) You further said that from the evidence that it showed that she was possessive, that she wanted her lawyer, she wanted her doctor, she wanted to possess them. Doctor, when a person is sick, they hire a doctor. That is logical. That isn't possessive, is it?

"A. Yes, you find people possessive even under illnesses.

"Q. A woman that is engaged in numerous business activities, would it be wrong for her to make inquiry of and depend somewhat upon her banker for advice in financial dealings?

"A. Yes, you expect to depend on them.

"Q. A woman who is in—At the time this instrument was executed in which most of the testimony has been, she was seventy-six years of age and eighty-six at the time of her death. She had arthritis and rheumatism and other ailments that limited her movement. Was anything unnatural for her attorney or her banker or her insurance representative or car salesman to call upon her and transact ordinary business for her? Did that make her possessive?

A. I think you will find that if she was that ill that she couldn't go to the bank or to see her lawyer, then she couldn't transact her business too well.

"Q. If she had brains enough to know that she needed a banker's assistance or lawyer's assistance, would that make her incompetent and graspy?

"A. Yes."

The remarks of the trial judge plainly indicate that the testimony of Dr. Harris was not disregarded. It was rejected by the trial judge after having fully considered all the evidence. There is nothing in the record to indicate that the trial court did not give the testimony of Dr. Harris the consideration to which it was entitled. *It should not have been so considered as to nullify all nonexpert testimony in conflict with it (In re Estate of Millar, supra), nor should it have been so considered as to nullify the expert testimony of medical doctors who attended the testatrix in her lifetime even though they were not specialized in psychiatry and neurology.*

Our decision is therefore controlled by the rule stated in *Bradley v. Hill*, 141 Kan. 602, 42 P. 2d 580. Where the trial court, in an action to set aside a will (including the codicils thereto) because of

the testamentary incapacity of the testatrix, holds under conflicting testimony that the testatrix was mentally competent to make the will, and such finding is sustained by substantial evidence, the finding is conclusive on appeal.

The value of property consists largely in the right to dispose of it as the owner desires, and this power of disposal, either by deed or by will, is not to be interfered with so long as the requisite mental capacity exists. (*Cole v. Drum,* 109 Kan. 148, 197 Pac. 1105, and cases cited therein.) The right to make a will includes the right to make it according to the testatrix' own desires, subject only to the statutory restrictions. It is no condition of this right that the will shall please a jury, or a court, or the testatrix' relatives, or anyone else. If the will was properly executed, and the testatrix was of competent sanity, and no undue influence has been established, it is the testatrix' will, and no tribunal is appointed on earth to inquire whether it ought to have been her will. (*Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634.)

The judgment of the trial court is affirmed.